**HEAD SKI COMPANY, Inc.,**

v.

**KAM SKI COMPANY, Inc., Frank J. Kaminski, Peter (Petrus) J. Meyer, William Meyer.**

No. 8998.

United States District Court
D. Maryland,
Civil Division.

Jan. 24, 1958.

for plaintiff or for Howard Head, who conducted the business as an individual before organizing the plaintiff corporation, (2) a finding that defendants' ski infringes U. S. Patent No. 2,694,580, which was issued to Head and assigned by him to plaintiff, (3) an injunction against such infringement, (4) an accounting, and (5) damages.[1]

At the request of both sides, all issues except the issues of accounting and damages were referred to Robert Roy, Professor of Industrial Engineering and Dean of the Engineering School of the Johns Hopkins University, as special master, under Rule 53, F.R.Civ.P., 28 U.S.C.A. The master heard testimony, visited plaintiff's plant and defendants' plant, observed their methods of operation, considered other evidence, and filed an elaborate report. (I) He found that defendants were using many trade secrets which they had learned while working for plaintiff and that "defendants could not have produced their ski at all but for the knowledge gleaned from their employment by the plaintiff", and recommended that defendants be restrained altogether from the manufacture of adhesively bonded metal skis. (II) He found that defendants' design "represents a significant improvement in the art of ski making" and concluded as a mixed question of fact and law "that the Kam ski does not violate the patent held by Howard Head". The case is now before the court on exceptions to the master's report.

Frank T. Gray, Baltimore, Md. (McKenny W. Egerton and Piper & Marbury, Baltimore, Md., on the brief), and Richard K. Stevens (Stevens, Davis, Miller & Mosher, Washington, D. C., on the brief), for plaintiff.

David D. Merrill, Baltimore, Md., for defendants.

THOMSEN, Chief Judge.

Plaintiff seeks (1) an injunction restraining defendants from using for their own purposes or disclosing, publishing or making known to anyone for any purpose the trade secrets which the individual defendants learned while working

■ At the hearing on the exceptions both sides offered additional testimony. The special master was present and, after considering the additional testimony, made an oral supplemental report on the issue of trade secrets, in which he adhered to his previous conclusion. The master's findings of fact with respect to the trade secrets are supported by substantial evidence, are not clearly erroneous, and therefore must be accepted by the court under Rule 53(e)(2). More-

1. The Court has jurisdiction of this action under 28 U.S.C.A. secs. 1332, 1338(a), 1338(b), and under 35 U.S.C.A. sec. 281.

over, I find that they are clearly correct. They will be summarized in this opinion, but will not be set out in such detail as to disclose the trade secrets it is the purpose of this action to protect.

Plaintiff contended that the master had made an error of law in that part of his report dealing with the issue of patent infringement. The master, therefore, submitted to questioning on that issue by the court and by counsel for the respective parties.

### Facts

In 1944–45, Wayne M. Pierce, Jr., an engineer employed by the Chance-Vought Division of United Aircraft Corporation, developed the idea of making a ski by adhesively bonding metal top and bottom facing sheets to a fibrous core. He applied for a patent in 1946, and U. S. Patent No. 2,525,618 for a "ski of laminated construction" was issued to him in 1950. United Aircraft made 120 pairs of such skis in 1945–46. The Tay Company, a corporation organized by Pierce, made and sold 10,000 pairs during the years 1946–51, most of them in 1947. The Pierce ski was not commercially successful in the United States, although it is still being manufactured and sold by foreign licensees, using equipment manufactured by Pierce in the United States. The main defects in the Pierce ski were the softness of the corners of the bottom facing sheet and the failure to provide a satisfactory running surface.

In March, 1947, Howard Head conceived the idea of making a ski out of aircraft materials by aircraft construction techniques, similar in many respects to the Pierce ski, but having steel strips secured along the bottom edges of the lower facing sheet, with a plastic coating on the bottom of the lower facing sheet extending over a portion of the said strips, the coating functioning as the running surface of the ski, and the exposed portions of the steel strips constituting corners of the ski and presenting sharp biting edges.

In May, 1947, Head rented shop space in Baltimore and began actively to pursue his idea. In August, 1947, he employed the defendant Kaminski, who, like Head, was an employee of the Glenn L. Martin Company, to work with him two evenings each week and on Saturdays, at a wage rate of $1.50 per hour. In November Head employed the defendant Petrus Meyer, also a Martin employee, on the same basis.

In January, 1948, Head resigned from the Martin Company to devote full time to the ski project, but in a few months his funds became exhausted and he was forced to take another job; however, he continued to spend many hours on the development of his ski. The defendants Meyer and Kaminski continued to work part time for Head, deferring payment of wages, and keeping an informal log of hours on the shop wall. Head made great sacrifices of time, energy and money in the pursuit of his idea, encountering and overcoming a succession of obstacles. Kaminski and Meyer also worked with their hearts as well as with their heads and hands. Many of the ideas and techniques which culminated in a successful metal and plastic ski were theirs, conceived and applied during their employment by Head.

By June, 1951, the Head ski had become successful enough to sell and the back wages of the employees were paid. In December, 1951, bonuses of $1,000 each were paid to Meyer and Kaminski, and they signed written agreements in which they acknowledged full settlement of back wages, accepted a future wage rate of $2.50 per hour, and agreed not to "divulge or impart any trade secret or company's business to any person, firm or corporation whatsoever".

Head obtained a license from the holder of the Pierce patent and patented the Head ski as an improvement. Head's application was filed February 27, 1951, and after repeated amendments of his original claims, patent No. 2,694,580 for a "composite wood and metal ski having plastic running surface" was issued to him on November 16, 1954. The exact language of Head's claims will be set

out below in the discussion of the patent infringement issue.

During the winter of 1950–51 Head sold 300 pairs of skis; during the following winter sales rose to 1,100 pairs; 2,300 pairs were sold in 1952–53; 4,500 pairs in 1953–54; 8,000 pairs in 1954–55; 18,000 pairs in 1955–56; 23,000 pairs in 1956–57. To secure capital for this expansion, Head formed the plaintiff Head Ski Company, Inc., in the spring of 1953, and assigned to it his entire proprietorship in return for approximately 60% of its stock.

Petrus Meyer continued to work for Head and the corporation on a part time basis until February, 1954, Kaminski until November, 1954. Meanwhile, early in 1954, at about the same time that he left the Head Company, Meyer began working on a ski of his own in the basement of his home. He invited Kaminski to join him, and they have continued to work together ever since. During most of the year 1954 Kaminski worked concurrently as a joint venturer with Meyer and as an employee of the Head Company. For a brief time the defendant William Meyer also worked concurrently for the plaintiff and for the other defendants. Late in 1955 Petrus Meyer and Kaminski, with their respective wives, formed the defendant Kam Ski Company, Inc., which took over the business that had been developed by Kaminski and Meyer.

## Trade Secrets

The master found that Kaminski and Meyer undertook to make skis only because they had worked for Head; otherwise they would never have had the idea of making a metal ski. In their operations they used not only Pierce's basic idea, for which they obtained a license, and Head's improvements thereto, for which they obtained no license, but also many of the same materials and manufacturing methods which they had used as employees of Head and of the plaintiff corporation.

The master, therefore, posed to himself these questions: "did Kaminski and Meyer derive the necessary knowledge to make their ski from their employment with Head, or from their general knowledge of the arts of manufacture? * * could they have proceeded as they did, independently of the knowledge gained as Head's employees, by examination of skis purchased in the open market and application of their experience as skilled mechanics?".

In his report, which has been sealed, the master considered in detail the design of the Head ski and the design of the Kam ski, the materials used, and the manufacturing methods employed by plaintiff and by defendants, respectively, listing many of the differences as well as the similarities in design and in manufacturing methods. He found that the methods used in the Kam plant for most of the major manufacturing processes, such as molding and finishing, are essentially the same as those used in the Head plant, where the best methods, which were sometimes the only practicable methods, had been determined by trial and error over years of experimenting. Defendants used these methods from the beginning of their operation, without the need for experimenting. Although many of the tools and processes are used elsewhere, for various purposes, the same choices from among available tools and processes, and particularly the same combinations of tools and processes, would be most unlikely to result from an independent approach to the problem by two separate groups.

Similarly, although the materials used are available for purchase by anyone, the choice of a particular material was dictated by years of experimenting. Tests of a ski purchased on the open market would have disclosed many of the secrets, if one knew which tests were important. But the qualities for which one should test the materials are an important part of the secrets learned over the years. Defendants did not buy a Head ski on the open market and test the materials. They had learned while working for Head what materials he used, and where a test was necessary they tested material.

on which they had been working for Head. With respect to the matters which could have been learned by testing, the following quotation from Franke v. Wiltschek, 2 Cir., 209 F.2d 493, 495, is pertinent: "It matters not that the defendants could have gained their knowledge from a study of the expired patent and the plaintiffs' publicly marketed product. The fact is that they did not. Instead they gained it from the plaintiffs via the confidential relationship, and in so doing incurred a duty not to use it to plaintiffs' detriment."

The master recognized that certain design features of the Kam ski have been independently conceived by defendants. He said: "By use of anodizing for the top surface the defendants have created an innovation of importance, and one which no doubt would have great appeal to prospective customers. Their adoption of Martin hard coat as a running surface is similarly an important independent contribution. It is this which makes possible the use of double aluminum bottom skins and a method of containing the steel edge runners that in my opinion is superior to the Head design. Kam's steel edges are not only protected throughout the length of the ski by a partial cover of aluminum, they are also extended into part of the nose curve, as an important added detail." The master concluded, however: " * * * the defendants could not have produced their ski at all, but for the knowledge gleaned from their employment by the plaintiff".

■ The duty to protect an employer's trade secret exists apart from a contract embodying the obligation. DuPont de Nemours Powder Co. v. Masland, 244 U.S. 100, 37 S.Ct. 575, 61 L.Ed. 1016; Colgate-Palmolive Co. v. Carter Products, 4 Cir., 230 F.2d 855, 864; A.L.I. Restatement of Agency, sec. 396(b). A fortiori it exists in the instant case, where the duty was made explicit by a written contract.

■ Defendants contend that plaintiff's processes, methods and materials cannot be trade secrets, since they are known to and used by aircraft mechanics and engineers. This overlooks the fact that a knowledge of the particular process, method or material which is most appropriate to achieve the desired result may itself be a trade secret. So may a knowledge of the best combination of processes, methods, tools and materials. "The mere fact that the means by which a discovery is made are obvious, that experimentation which leads from known factors to an ascertainable but presently unknown result may be simple, we think cannot destroy the value of the discovery to one who makes it, or advantage the competitor who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price in labor, money, or machines expended by the discoverer * * *." A. O. Smith Corp. v. Petroleum Iron Works Co., 6 Cir., 73 F.2d 531, 538, 539.

■ "A trade secret may consist of any formula or pattern, any machine or process of manufacturing, or any device or compilation of information used in one's business, and which may give to the user an opportunity to obtain an advantage over competitors who do not know or use it." A.L.I. Restatement of Torts, sec. 757(b); Mycalex Corp. v. Pemco Corp., D.C.D.Md., 64 F.Supp. 420, 423.

Fulton Grand Laundry Co. v. Johnson, 140 Md. 359, 117 A. 753, 23 A.L.R. 420, is not to the contrary. The claimed trade secret in that case was the identity of the laundry's customers. The Maryland Court said: "A thing can hardly be said to be a secret, in the sense that it should be guarded by a court of equity, which is susceptible of discovery by observation, and which is open to the observation of any one who thinks it worth while to observe." That is not true in the instant case.

Other ski manufacturers, in this country and in Europe, have endeavored to produce a metal ski which would compete successfully with Head's, but have failed to do so despite their knowledge and experience. Defendants were able to do so immediately, because of the knowledge

they had gained during their employment at plaintiff's plant.

Defendants in the instant case are not helped by the fact that the Fourth Circuit eliminated one process from the injunction in the Colgate-Carter case on the ground that it was "well known". 230 F.2d at page 865. The court held flatly that Fine "was not entitled to give to Colgate the benefit of business secrets which had been disclosed to him at Snell's" (Carter's agent). The court also said: "Nor is it a defense that Fine upon his employment was entitled to use his skill in Colgate's interest". 230 F.2d at page 864. Other courts have recognized the "considerable danger in stressing in this branch of the law the assumed ability of a 'good mechanic' ", as Judge Clark put it in Franke v. Wiltschek, supra. The opinion in that case continued: "Even as to patents the capability of that ubiquitous genius has been questioned and his destructive effect on the law of inventions somewhat deplored. Be that as it may, there is a positive danger in resort to the same device to justify the marauding instincts of trust violators, since thereby the carefully built law of trade secrets may be destroyed as a practical matter and such business assets be left open to highjacking from all sides." 209 F.2d at page 498–499.

■ The master recommended an order restraining defendants altogether from the manufacture of adhesively bonded metal skis. A broad injunction appears to be necessary to protect plaintiff from unlawful use of its trade secrets by defendants. This is not a case where a technician having confidential knowledge of a restricted process reveals it to a competitor of the owner of the process. In such a case the court might properly enjoin the use of the process involved, and not the manufacture of the product. Colgate v. Carter, supra. In the instant case, however, defendants' entire operation has been built upon plaintiff's techniques, methods, materials and design. In such a case, an injunction against manufacture of the product is appropriate. Franke v. Wiltschek, D.C.S.D.N.Y., 115 F.Supp. 28, affirmed 2 Cir., 209 F.2d 493, supra.

The alternative would be an injunction listing the processes defendants are forbidden to use. But it would be impracticable if not impossible to enumerate all the secrets learned by defendants while working for plaintiff, some of which have already been used by defendants, and some of which may be used by them in the future. Plaintiff is entitled to a permanent injunction against the further manufacture by defendants or any of them of adhesively bonded metal, wood and plastic skis, and against their advising any person, firm, or corporation as to the manufacture or design of laminated skis of this nature, except that defendants may proceed with their efforts to secure a patent on the design features which the master found had been independently conceived by defendants and which are enumerated in that portion of the master's report dealing with those features which is quoted above in this opinion.

### Patent Infringement

The validity of the Head patent is not contested.

■ The master concluded that the Kam design does not infringe the Head patent. In reaching that conclusion, however, the master interpreted the Head patent as requiring that the strips or edge runners be set into marginal grooves in the bottom facing sheet. That requirement is included in claim 3 of the Head patent, but it is not included in claim 1 and claim 8, which are the broadest claims. Since the patentee is entitled to the benefit of his broadest claims, Smith v. Snow, 294 U.S. 1, 13, 14, 55 S.Ct. 279, 79 L.Ed. 721, it is necessary to review the master's conclusion on the patent infringement issue with these facts in mind.

Head's patent was issued as an improvement upon Pierce, No. 2,525,618, the second claim of which read as follows:

"2. A ski including a core sheet consisting of a plurality of pieces of wood adhesively secured together to form an integral core sheet with the grain of the pieces running normal to the plane of the sheet, and relatively thin facing sheets of metal adhesively secured to the end grain surfaces of said core sheet."

The Head ski and the Kam ski are both laminated skis having upper and lower facing sheets with a core material disposed between them. Both plaintiff and defendants are licensees of the assignee of the Pierce patent. Both the Head ski and the Kam ski have plastic side walls, but that is not important in this case.

The issues involved can best be understood by examining the accompanying sketch of the profiles of the skis made by plaintiff and defendants respectively. It must be remembered, however, that the Kam ski is to be compared with the claims of the Head patent and not with the particular ski which plaintiff is producing under that patent.

Claim 8 of the Head patent, which is the broadest of all the claims,[2] may be broken down into the following elements:

(a) A bottom and edge construction for a ski that comprises a metal facing sheet,

(b) a pair of strips of hard material,

(c) one face of one of said strips secured along one bottom edge of said facing sheet,

(d) one face of the other of said strips secured along the other bottom edge of said facing sheet,

(e) and a coating on the bottom of said facing sheet,

(e.1) covering a substantial portion of the other faces of said strips but leaving exposed a portion of each of said strips,

(f) said coating functioning as the running surface of the ski, and

(g) said exposed portions constituting bottom corners of the ski and presenting sharp biting edges.

As to (a), the facing sheet of the Head ski is a single sheet of metal, to which is bonded a coating which extends over most of the bottom surface of the lower facing sheet and functions as the running surface of the ski. The Kam ski uses two sheets of aluminum bonded together, the lower ply surfaced with Martin's hard coat, very thin and hard, which provides a running surface receptive to wax and lacquer.

The Kam ski, like the Head ski, has (b) a pair of strips or runners of hard material, which in practice are continuous steel strips, (g) the exposed portions of which constitute the bottom corners of the ski and present sharp biting edges.

Plaintiff contends (c) that one face of one of Kam's strips is secured along the bottom edge of the facing sheet and

2. The other claims read as follows:
"1. In a laminated ski including an upper and a lower facing sheet having a core material disposed therebetween the improvement that comprises a pair of strips of hard material, one face of one of said strips secured along one bottom edge of said lower facing sheet, one face of the other of said strips secured along the other bottom edge of said lower facing sheet, and a coating on the bottom of said lower facing sheet covering a substantial portion of the other faces of said strips but leaving exposed a portion of each of said strips, said coating functioning as the running surface of the ski, said exposed portions constituting corners of the ski and presenting sharp biting edges.

"2. In a laminated ski as defined in claim 1 the further improvement of said strips being of metal harder than the metal of said facing sheets.

"3. In a laminated ski as defined in claim 1 the further improvement of the bottom of said lower facing sheet being marginally grooved and said strips being set into said marginal grooves.

"4. In a laminated ski as defined in claim 3 the further improvement of said marginal grooves being diagonal to the plane of the surface of said lower facing sheet.

"5. In a laminated ski as defined in claim 1 the further improvement of said strips being bonded to the bottom edges of said lower facing sheet.

"6. In a laminated ski as defined in claim 1 the further improvement of said lower facing sheet being slotted on each side adjacent the tip of the ski, said strips passing through said slots and the front ends of said strips being fixed internally of said ski.

"7. In a laminated ski as defined in claim 6 the further improvement of means to fix the back ends of said strips adjacent the rear of the ski.

*    *    *    *    *

"9. A bottom and edge construction for a ski as defined in claim 8 wherein the bottom of said facing sheet is marginally grooved and said strips are set into said marginal grooves.

"10. A bottom and edge construction for a ski as defined in claim 9 wherein said marginal grooves are formed diagonally to the plane of the surface of said facing sheet."

Claim 8 is essentially the same as claim 1 except that it deals only with the bottom and edge construction.

(d) that one face of the other strip is secured along the other bottom edge of the facing sheet. Defendants dispute this contention, which will be discussed below as question 1.

Both skis have (e) a coating on the bottom of the facing sheet. In the Head ski the coating, which in practice and in teaching is made of plastic, (e.1) covers a substantial portion of the other faces of said strips but leaves exposed a portion of each of said strips, and (f) functions as the running surface of the ski. Plaintiff contends that the bottom ply of the aluminum facing sheet in the Kam ski constitutes a coating within the meaning of Head's claims. This contention will be discussed below as question 2.

1. In Kam's ski, is one face of each of the steel strips secured along a bottom edge of the facing sheet? Plaintiff contends that the word edge in the Head patent refers to the line running the length of the ski, shown as a point designated "x" on the accompanying sketch. Plaintiff then argues that the steel strip or runner is secured along that edge, although the upper part of the strip is secured to the bottom of the facing sheet all the way out to the actual edge of the facing sheet, and the bottom of the strip is secured to the top of the plastic coating for most of the width of the strip. The master questioned that construction of the word edge, and stated that he understood the word edge, as used in claims 1 and 8 of the Head patent, to mean that portion of the facing sheet to which the top of the strip is secured. If the master's construction is adopted, it is apparent that the strip in the Kam ski is not secured along a bottom edge of the facing sheet. The top of the strip is bonded to the plywood core and the plastic side of the ski, and the bottom of the strip is bonded to the beveled upper surface of the lower ply of the facing sheet. Plaintiff considers the lower ply in the Kam ski as a mere coating to the upper

ply, and contends that the two lower outside edges of the upper ply are the bottom edges of the facing sheet. Plaintiff therefore argues that the steel strips in the Kam ski are secured along those lines, although not secured to them.

■ I agree with the master that the claims of the Head patent do not literally read upon the Kam ski in this respect. Plaintiff's protection, however, is not so limited; its patent carries a reasonable range of equivalents. The considerations which should govern the extent of the range of equivalents are set out in Graver Tank & Mfg. Co. v. Linde Air Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, and in Long Mfg. Co. v. Holliday, 4 Cir., 246 F.2d 95, 100, and need not be repeated here. Giving effect to those considerations, I conclude that if the lower ply of the facing sheet in the Kam ski is equivalent to the coating specified in claims 1 and 8 of the Head patent, the positioning of the steel strips in the Kam ski is essentially the same as the positioning of the strips in the Head patent and the differences are inconsequential. That brings us to the controlling question in the case.

2. Is the bottom ply of aluminum in the Kam ski a coating within the meaning of Head's claims, or equivalent to the coating specified in claims 1 and 8 of Head's patent?

■ The master stated that the bottom ply of aluminum in the Kam ski retains and protects the steel strips or runners better than the plastic coating used by plaintiff. The Head patent, however, does not limit the coating material to a plastic. It might be aluminum, it might be thick or thin, strong or weak, so long as it is sufficient to retain and protect the steel runners. If the bottom ply of aluminum serves essentially the same function as the coating in the Head claim, the fact it may serve that function better does not prevent infringement, even though the improve-

ment may be patentable. Frick Co. v. Lindsay, 4 Cir., 27 F.2d 59, 62; Herman v. Youngstown Car Mfg. Co., 6 Cir., 191 F. 579.

The bottom of the ski must also furnish a satisfactory running surface. The plastic coating of the Head ski has this quality. Kam uses a thin coating of Martin hard coat on the aluminum bottom of the ski to achieve this objective. In this respect the bottom ply of aluminum with its thin coating performs the same function as the coating specified in the Head patent and as the plastic coating used by plaintiff.

The master also stated that the bottom ply of aluminum in the Kam ski contributes to the structural strength of the ski to a far greater extent than the plastic coating used by plaintiff. Plaintiff achieves the necessary structural strength and stiffness by using a single-ply aluminum facing sheet which is considerably thicker than either of the two plies of the Kam ski. There is no showing that the combination of facing sheet and coating in the Head patent is not sufficiently strong or stiff.

The master stated that the bottom ply of aluminum in the Kam ski serves a necessary structural function because of the thinness of the upper ply. He indicated, therefore, that the bottom ply is something more than a coating. However, he agreed that although the word coating does not imply or connote a structural member, it does not exclude some structural function. No doubt the bottom ply in the Kam ski has a structural function as well as the function of the coating called for by claims 1 and 8 of the Head patent; but that does not prevent the bottom ply from being a coating within the meaning of the Head claims, or the equivalent of such a coating, and does not prevent the Kam ski from infringing the Head patent.

Plaintiff is entitled to an injunction restraining defendants from infringing its patent.