**KODEKEY ELECTRONICS, INC.,**
**Plaintiff-Appellee,**

v.

**The MECHANEX CORPORATION et al.,**
**Defendants-Appellants.**

**No. 73–1303.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Aug. 14, 1973.

Decided Oct. 11, 1973.

Charles F. Brega, Denver, Colo., for plaintiff-appellee.

Harry L. Hobson, Graham M. Clark, Jr., and Thomas A. Faulkner, Denver, Colo., for defendants-appellants.

Before BREITENSTEIN, BARNES * and BARRETT, Circuit Judges.

BARNES, Circuit Judge:

This is a civil diversity action seeking money damages and injunctive relief which would prohibit defendant from manufacturing, distributing, and selling a certain electronic speedometer and tachometer. The complaint charges (1) misappropriation of trade secrets, (2) breach of contract, and (3) unfair competition. Kodekey Electronics is a Cali-

* Honorable Stanley N. Barnes of the Ninth Circuit, sitting by designation.

fornia corporation, and "defendant Mechanex is located in Colorado," and is a subsidiary of defendant Tenneco, a Delaware corporation.

Jurisdiction rests on 28 U.S.C. § 1332(a)(1) and the requisite amount in controversy exists. The District Court tried the issue of liability first, and found a basis for recovery, and granted judgment on the three charges above listed. It originally issued a restraining order, reserving its findings and conclusions with respect to damages, but thereafter fixed damages in the sum of $201,768.00, together with costs. The District Court thereafter signed an order modifying its opinion and order, and denied defendants' Motions to Reopen, for a Partial New Trial, and for a New Trial.

## I. FACTS

On June 9, 1966, Mr. Joseph Kramas, and one Erich Kaufmann, individually, and doing business as K & K Electronics, received an exclusive license to manufacture and market a new type of speedometer which had been developed by one Frank D. Neu and one John Foraker (Plaintiff's Exhibit C).

In November, 1966, Mr. Joseph Kramas, representing K & K Electronics, a partnership, and predecessor of Plaintiff Kodekey Electronics, Inc., approached Mr. Allen J. Stephens of the Mechanex Corporation, and suggested that Mechanex should market an electronic speedometer then being manufactured and sold by K & K Electronics. At that time Mr. Kramas felt that his offering was promising, but that his product needed marketing attention on a national scale (Tr. Vol. I, p. 25).

Mr. Neu and Mr. Foraker had been testing prototypes of their new speedometer with the Greyhound Corporation previous to the execution of the licensing agreement. Subsequent to the exe-

cution of the licensing agreement, Mr. Kramas was contacted by Freightliner Corporation (a manufacturer of trucks for Greyhound Moving Corporation), and was asked whether it would be possible to modify the speedometer, as installed in the Greyhound Buses, for use in trucks. Mr. Kramas then began investigating the speedometer plights of other trucking firms in the California area, and found that a serious problem existed with respect to speedometers in the trucking industry (Tr. Vol. I, p. 26). Mr. Kramas thereupon compiled a mailing list and sent inquiries to large and small trucking firms throughout the country, and received significant responses regarding the problems that the trucking industry was experiencing with regard to speedometers and tachometers.

After approaching the Mechanex Corporation in November, 1966, regarding the possibilities that Mechanex might market the instrument on a national scale, Mr. Kramas insisted that a secrecy agreement be signed by a corporate officer of Mechanex before a consignment speedometer would be sent to Mechanex for evaluation by the Mechanex Corporation (Plaintiff's Exhibit K). Mr. Allen J. Stephens signed the secrecy agreement for the Mechanex Corporation and returned it by mail to the Plaintiff on December 5, 1966 (Plaintiff's Exhibits L and M). The provision of said secrecy agreement is as follows:

The MECHANEX CORPORATION agrees to keep confidential all proprietary information regarding Electronic Speedometer furnished by K & K ELECTRONICS and not to use this information in any way detrimental to the interests of K & K ELECTRONICS. Further this information will not be distributed to a competitor of K & K ELECTRONICS or be used by MECHANEX to compete with K & K ELECTRONICS in the field of Electronic Speedometers.[1]

---

1. We note some difference in the language used by the parties to this appeal in describing this agreement.

Appellants refer to it as an agreement covering "trade secrets";

Appellee refers to it as a "secrecy agreement";

The agreement requires Appellant "to keep confidential all proprietary information furnished by Appellee, not to use this informa-

Further details of the facts are set forth in the margin, for the convenience of the readers of this opinion. They are essential to a complete understanding of the issues ruled upon by the District Court, but not to an understanding of the controlling principles upon which this opinion is based.[2]

tion in any way detrimental to the interests of Appellees, not to distribute (this information) to a competitor, or be used by Appellant to compete with (Appellees) in the field of Electronic Speedometers."

Thus the agreement's existence and its precise terms are not in dispute. We suggest it is much more than either a secrecy agreement or an agreement covering "trade secrets", only.

2. We use Appellee's language:

When Mr. Kramas traveled from California in December of 1966 to visit the Mechanex Corporation in Denver, he brought with him a completed unit, along with the brackets, cable, magnets, and a disassembled unit, so that the Mechanex Corporation could ascertain the internal workings, circuit board, and the specific electronic structure of the instrument (Tr. Vol. I, p. 28).

Kodekey and the Mechanex Corporation formed an operating contract in the early months of 1967, the culmination and substance of which is set forth in Defendants' Exhibit #202. The contractual terms were supported and given credence by oral conversations, written correspondence between the parties, their course of dealings and reciprocal commitments and actions of the parties (See Plaintiff's Exhibits O, P, S, T, V, W, X, Y, Z, UU and NNN). The bulk of the contractual provisions are also embodied in Defendants' Exhibits 15, 15–A and 15–B; it was demonstrated at trial (Tr. Vol. II, pp. 267–70) that Defendant Mechanex submitted these documents to Plaintiff knowing that Mechanex would not have performed according to the provisions specified therein. Under the contractual provisions, Kodekey (and its predecessor K & K Electronics) would receive a purchase order from the Mechanex Corporation for 3,000 speedometers at a purchase price of $72.50 per unit plus F.E.T. Upon purchase of these units, the Mechanex Corporation would have the *exclusive right* to purchase and sell Plaintiff's speedometers. The agreement was to continue so long as the Mechanex Corporation continued in its purchases. The parties agreed that after the Mechanex Corporation had purchased a total of 10,000 units, the parties would share equally in any cost saving over the cost of the original unit. Kodekey agreed to send 50 of its units for field testing, and if these units did not satisfactorily test for 50,000 miles, the Mechanex Corporation could cancel the order for the remainder of the 3,000 units.

The Mechanex Corporation actually proceeded with additional large scale purchases prior to the time when the initial 50 units had completed the field tests. Additional purchases were frequently made by the Mechanex Corporation without formal purchase orders.

The contract further provided that the Defendant, the Mechanex Corporation, could terminate the agreement after the purchase of 3,000 units. Under the contract, the Mechanex Corporation was not to manufacture, sell or otherwise deal in electronic speedometers manufactured by any firm except Kodekey Electronics during the term of the agreement or within two years thereafter. If Kodekey Electronics failed to accept or fill a purchase order, it would be prohibited from offering for sale or selling to any other customer, domestic or foreign, its electronic speedometer for a period of two years, and the Mechanex Corporation would be released from any obligation under the contract. The contract further provided that the Mechanex Corporation would be given a first right of refusal to market other new products of Kodekey during the term of the contract.

The agreed purchase price of the speedometers in 1967 was $72.50, but pursuant to the agreement of the parties, this wholesale price to the Mechanex Corporation was reduced to $60.00 per unit during the contract period. The Plaintiff, Kodekey Electronics, readily passed on these manufacturing savings to the Mechanex Corporation; however, the Defendant, Mechanex, maintained its selling price to the industry at a minimum of $94.50 per unit.

Between 1966 and 1970, the Mechanex Corporation purchased approximately 12,000 speedometer and tachometer units from Kodekey Electronics (Tr. Vol. II, p. 272).

In October or November of 1967, Mr. Allen J. Stephens, the president of the Defendant Mechanex Corporation, approached Fab Tool Company of Denver, Colorado, or one of their employees, concerning the making of a circuitry board for an electric speedometer (Tr. Vol. II, pp. 272–3). Engineering work on the circuitry of the electronic speedometer was performed for the Mechanex Corporation at Fab Tool Company during 1968 by one Jerry Steele, until January of 1969, when Mr. Steele was hired full-time by the Mechanex Corporation (Tr. Vol. II, p. 275). Mr. Steele, prior to 1968 had never seen an electronic speedometer in operation, and had never seen illustrations of speedometer theo-

The District Court, in its Memorandum Opinion of June 2, 1972, found that a valid and binding contract existed between the Plaintiff and Defendant for the distribution and sale by Defendant of a specific product of the Plaintiff; that the Defendant Mechanex had engaged in self dealing with the product in violation of contractual provisions (the electronic speedometer manufactured by the Defendant Mechanex being similar in appearance, operation and design and of the same general kind of product manufactured by Kodekey); that the manufacture of electronic speedometers by Defendant Mechanex was a clear violation and breach of the contractual agreement between Plaintiff and Defendant; that the Defendant Mechanex had engaged in unfair competition against Kodekey and had placed Kodekey in a disadvantageous position of marketing its electronic speedometer; that Plaintiff Kodekey was entitled to damages for the breach of contract and unfair competition; that the manufacture and merchandizing of the speedometer developed by the Defendant Mechanex violated the trust, confidence and fiduciary responsibilities imposed on Defendant Mechanex to the detriment and irreparable damage of Plaintiff Kodekey; and that an adequate remedy at law to protect the contractual rights of the Plaintiff against actions not being present, and the Plaintiff having sustained its burden of proving the reasonableness of the restrictive covenants, that enforcement of the restrictive non-competitive agreements by injunction was reasonable, and would not unduly injure the Defendants in their overall manufacturing operation.

## II. ERRORS CLAIMED

Appellant urges seven errors. We will consider each in turn:

I. Did any information given to Mechanex by Kodekey constitute a "trade secret"?

II. Assuming one or more "trade secrets" were given to Mechanex, did Kodekey fail to take secrecy precautions essential to maintain such trade secret status?

III. If no "trade secrets" were given to Mechanex, did any other relationship exist between it and Kodekey which prevented Mechanex "from selling the speedometer developed by Mechanex"?

IV. Does the statute of frauds in Colorado prohibit the enforcement of the oral non-competition agreement found by the District Court to exist?

V. Is there sufficient evidence properly in the record to support the award of damages?

VI. Was injunctive relief appropriate?

VII. Was denial of a new trial error?

## III. THE "TRADE SECRET" ARGUMENTS

(Appellants Alleged Errors I, II & III)

██ Appellants base their first three alleged errors on an assumption that a "trade secret" [3] disclosure by Kodekey to

---

ry involving magnets (Tr. Vol. VI, p. 511); Mr. Steele began his engineering work by viewing a disassembled Kodekey unit provided to him by Defendant Mechanex Corporation (Tr. Vol. IV, pp. 513–15).

On January 8, 1970, Mr. Allen Stephens of Mechanex telephoned Mr. Kramas of Kodekey, informing Mr. Kramas that the Mechanex Corporation would no longer purchase speedometers from Kodekey, and that Mechanex intended to sell electronic speedometers and tachometers which it would manufacture itself beginning in March, 1970. The Mechanex Corporation had not informed Mr. Kramas of the termination prior to this time, and refused at this time, to provide Kodekey Electronics with a customer list that had been utilized in the sale of the units (Tr. Vol. II, p. 277). The Mechanex Corporation did not inform Kodekey of its intentions prior to this time, because Mechanex considered Kodekey to be a competitor, and Mechanex had continued the relationship while they were developing their own unit because Mechanex' relationship with Kodekey was still of benefit to Mechanex (Tr. Vol. IV, pp. 568–69).

3. . . . [A] trade secret is not necessarily a secret within the common use of

Mechanex was the sole content of their signed contract delivered to Appellee on December 5, 1966; and that there were no other obligations subsequently created between the parties. This is not correct. The December 5, 1966 agreement was also an agreement not to compete and not to detrimentally use the information obtained (*See* Note 1, *supra*). But more important, the District Court found that the parties also entered into an operating contract, had subsequent oral conversations, written correspondence, and reciprocal commitments and actions, including voluntary representations to third parties. Mechanex Corporation obtained the *exclusive right* to purchase and sell, and did purchase and sell, in great quantities, Appellee's superior product. Mechanex was given the right to cancel the contract after the purchase of 3000 units, but was required to buy speedometers exclusively from Appellee during the term of the agreement, and within two years thereafter. This provision was reciprocal: Kodekey was required to accept or fill any purchase order, and if it did not, it would not offer to sell or sell to any other customer, foreign or domestic, for a similar period of two years. Mechanex further had a first right of refusal to market

other new products of Kodekey during the terms of the contract. Under these contractual provisions, Mechanex purchased, between 1966 and 1970, some 12,000 speedometers.

In view of these facts, and the findings of the District Court which went far beyond the suggestion of Appellants that the court was merely dealing with trade secrets,[4] we find the first three arguments of Appellant untenable. In this connection we point out the court's specific findings.

"Damages awarded herein are assessed against Defendants for breach of contractual duties, breach of fiduciary responsibilities imposed on Mechanex, unfair competition, and for the breach of a secrecy agreement." (Tr. Vol. VI, p. 535.)

Thus, were we to find there was no breach of a secrecy agreement relating to "trade secrets", that does not invalidate the other facts, findings, and conclusions establishing liability of Defendants-Appellants on other grounds.

However, Appellants insist "the electronic speedometer . . . was a combination of generally known elements and components of electronic circuitry. Accordingly, whether or not the

---

that word. It is at best a nebulous concept which at least the court has indicated is somewhat incapable of definition. [Sarkes Tarzian, Inc. v. Audio Devices, 166 F.Supp. 250, 257–258 (S.D.Cal.1958) (Applying California Law); aff'd 283 F.2d 695 (9th Cir. 1960), cert. den. 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859 (1961).] ". . . The secrecy requirement is the catalyst which raises liability in the fiduciary or confidential relationship." Sloan, Trade Secrets: Real Toads in a Conceptual Garden, 1 West.St.U.L.Rev. 131 (1973).

4. Appellants' position with respect to a "trade secret," which is actually *not* a "trade secret"—tho characterized as such by the secrecy agreement—largely, if not entirely, rests upon cases dealing with a covenant of secrecy made by an employee at the commencement of his employment, and his later discovery that the "trade secret" was non-existent. "A distinguishing qualification" (according to appellant) "which creates an exception to the general rule." *See* Reply Brief, p. 17, and cases therein cited

appearing in Note 11, Callman, § 53.3, p. 390. [L. M. Rabinowitz & Co. Inc. v. Dasher, 82 N.Y.S.2d 431 (Sup.1948) (employee); Nat'l Rejectors v. Trieman, 409 S.W.2d 1 (Mo.1966) (employee); Briggs v. Butler, 71 Ohio App. 48, 47 N.E.2d 812 (1942) (employee).] While we can agree with Appellant and Callman (Callman is herein used as referring to Callman, Unfair Competition, Trademarks and Monopolies, (Third Ed., Supp.1973)), that such exception is good law, we cannot agree it is here controlling, because (a) this is not such a factual case; *i. e.*, involving an employee; and (b) the court's findings of fact as to the nature of the confidential and fiduciary relationship existing between the parties herein, differ from the facts cited in the above noted cases, and others cited by Appellant.

"What is a secret poses a question of fact to be determined by the court." *Callman, supra*, § 53.3, p. 390. A trial court's finding of fact is binding upon appellate courts, unless we find them clearly erroneous—a finding we cannot here make.

design should be accorded the status and the protection of a trade secret depends upon the uniqueness and value of the combination of elements . . . ."

■ The Restatement of Torts § 757, comment b at 6–7 (1939) is to the contrary. "Novelty and invention are not requisite for a trade secret as they are for patentability . . . (here a discussion of patent law). But such is not the case with a trade secret. Its protection is not based on a policy of rewarding or otherwise encouraging the development of secret processes or devices. *The protection is merely against breach of faith and reprehensible means of learning anothers secret."* (emphasis added).

A recital of the conduct of the Appellant Mechanex which began very shortly after the original contact and contracts took place between the litigants is here extremely revealing.[5]

■ Appellee very properly relies on the law as to what constitutes a trade secret is a question of fact for the trial court. (*See* Note 3, *supra.*) We cannot say the court's conclusions on the facts herein are clearly erroneous. E. I. DuPont de Nemours & Co. v. United States, 288 F.2d 904, 911, 153 Ct.Cl. 274 (1961); Imperial Chemical Industries, Ltd. v. National Distillers & Chemical Corp., 342 F.2d 737, 742 (2d Cir. 1965) modified, 354 F.2d 459 (2d Cir. 1965); Head Ski Co. v. Kam Ski Co., 158 F.Supp. 919, 923 (D.C.Md.1958); *Compare,* Callman: Unfair Competition, Trade & Monopolies, § 52.1, pp. 371–73, and § 52.2, pp. 380–81, 390 (1968).

And as to the uniqueness of the speedometer, we note that the court found (Tr. Vol. VI, n. 8, p. 385), among other findings, that when Mechanex Corporation desired to merge with Defendant Tenneco, Inc., in 1968, Mechanex stated that "there was no similar speedometer" on the market.

■ Finally, as to whether trade secrets were here involved.

"A trade secret may consist of any formula, patent, device, plan, or *compilation of information which may be used in one's business and which gives a person an opportunity over his competitor.* The economic report in the case at bar is a study of the costs involved in the water transportation of LPG; *its underlying contribution is to demonstrate the comparative advantage of such transportation over other methods of transportation.* This report is manifestly integrated into the [Defendant's] plans . . . . The [Defendant's] plans palpably constituting a trade secret.

\* \* \* \* \* \*

. . . . [T]he proofs support the contention the economic report and the [Defendant's] plan were trade secrets or, at least, *plaintiff's proprietary interest in them should, in law and equity, be treated the same as trade secrets;* disclosure was made to the defendant in confidence . . . . " International Industries Inc., v. Warren Petroleum Corp., 99 F.Supp. 907, 914–915 (D.C.Del.1951) (emphasis added).

We find little merit in Appellants position that secrecy precautions were allegedly not taken by Kodekey. It took the primary and essential precaution in requiring a "secrecy-plus" agreement from Appellant prior to any disclosure.

As *Callman, supra,* states:

"An employee's express agreement 'not to disclose any of the processes and methods' of his employer is a positive acknowledgement of the fact that some of such processes and methods are secret; the stipulation would otherwise be meaningless." (Appellee's Brief, p. 31 and *Callman,* p. 390.)

Such an interpretation · applies with stronger reason to an agreement between a secret-holder and a non-employee than between owner and employee.

5. See again the last two paragraphs of Note 2, *supra.*

We think we are not required to discuss all cases cited by either side.[6] We note we have a problem with some of Defendants' references to their legal position.[7] But we are satisfied that the Appellants' first three alleged errors do not constitute error.

## IV. · STATUTE OF FRAUDS

■ Here the Appellant states that "the agreement" between the parties included the provision that Mechanex agreed not to compete with Kodekey in the manufacture or sale of electronic speedometers for a period of two years following the termination of the agreement—an agreement which obviously cannot be performed within a year. This was an oral agreement best set forth in the answer of Plaintiff to Defendant, Interrogatory No. 90 (Defendants' Exhibit 202). *Cf.* Court's Memorandum Opinion, p. 7.

Appellant relies upon Colo.Rev.Stats. § 59–1–12(1)(b) which states that any contract which cannot be performed within a year of the time of making, must be in writing and signed by the party sought to be charged. (Op.B. p. 28.) The holding below, says Appellants, flies in the face of "the only applicable Colorado law on this issue"; DeBord v. Holcomb, 13 Colo.App. 161, 57 P. 548 (1899). That case does hold, as Appellant suggests, that the general rule

therein expressed "that the statute of frauds invalidates a two year contract not to compete, even though consideration has passed between parties for the sale of a business" is good law. But it also found that the violation of the oral agreement between the parties was the only wrongful act of the Defendant.

Then *DeBord* went on to say:

". . . . the principle upon which courts of equity will sometimes enforce specific performance of contracts, notwithstanding the formalities required by the statute of frauds have not been complied with, is not applicable to this class of cases. It is where the statute, which was designed to prevent fraud, is sought to be used for the purpose of a commission of a fraud, that equity affords relief. But the fraud against which equity will relieve notwithstanding the statute must consist of something more than the mere wrong of disavowing the contract; and, as the act of the defendants amounted only to a violation of their agreement, it does not constitute a fraud of such a nature as would authorize a court of equity to disregard the statute. · Browne, Stat. Frauds, § 437 et seq. . . ." *DeBord, supra*, 13 Colo.App., at 163, 57 P. at 549.

Here the facts of the case clearly show· that Defendant did "far more than

---

6. We note with. interest in, but without reliance upon, a lay opinion of the existence of diverse circuit rulings in this area of law:

"When different circuit courts come to different conclusions the law is simply not the same throughout the country, . . . (when) the Supreme Court has refused to step in with a final ruling. . . . [T]he prevailing review in the Sixth Circuit . . . gives companies with unpatented technical know how almost no power to keep employees from taking it to• competing companies, even if they have signed contracts pledging not to do so. Four other appellate courts have ruled that the companies can enforce such contracts, and the question is uncertain in the other six circuits." Business Week: "Law", August 11, 1973, at 43.

7. Defendant's state at pp. 26–27 of their brief that:

"The Court's conclusion that the electronic speedometer manufactured by Mechanex after development by Fab Tool, Inc. was the '*same*' as the Kodekey speedometer was in error." (emphasis added) But the court did not find they were the "same", but did find they were "similar."

"That defendant engaged in self-dealing with the product in violation of contractual provisions and the electronic speedometer manufactured by defendant is *similar* in appearance, operation and design and of the same general kind of product manufactured by plaintiff." (emphasis added) Tr. Vol. VI, p. 390.

the mere disavowing of the contract." *Cf.* Findings & Conclusions in "Memorandum Opinion & Order."[8]

Appellee refers us to three citations where courts have equitably recognized oral agreements concerning trade secrets. Jones v. Reynolds, 120 N.Y. 213, 24 N.E. 279 (1890); Lepel H. F. Labs, Inc. v. Capita, 278 N.Y. 661, 16 N.E.2d 392 (1938); 6 A.L.R.2d 1053, 1061 (1949).

We agree with the District Court that the Colorado law does not bar recovery herein because of Colorado's Statute of Frauds.

## V. SUFFICIENCY OF EVIDENCE

Appellant argues the District Court committed error in using figures which "were not properly in evidence"; because they were in Mechanex' response to a "Motion to Produce" (VI R. 509–10), filed by Defendants over their objections and protest. The principal objection made by Defendants was that "the figures furnished require explanation to be properly understood." (Op. Br. p. 31, et seq.) The explanation, as we understand Defendants' brief, is that "a sales figure of 5,532 units" during the six months period between June 2, 1972 through November 1972, "were made during a period of time when Defendants did not know whether their sale of electronic speedometers and tach-

ometers could be continued or not." Mechanex made every effort to deplete their stock on hand, and "sales were made, not to ultimate consumers, but to Mechanex distributors, on a 'forced' basis"; that "but for the threat of the enforcement of the announced injunctive relief, such sales would never have been made at that volume." (Op.Br. p. 32.) Also, that the court should have considered the sales of Kodekey during the same 1972 period in mitigation of damages.

Appellee relies strongly on two cases, *i. e.*, Julius Hyman & Co. v. Velsicol Corp., 123 Colo. 563, 233 P.2d 977 (1951), which involved the wrongful use of trade secrets under a contractual and fiduciary relationship, and Grange Mutual Fire Ins. Co. v. Golden Gas Co., 133 Colo. 537, 298 P.2d 950, 955 (1956).

The first case emphasizes the duty of the trial judge "when the issues of unfair competition, breach of contract, and violation of confidential and fiduciary relationship" are issues once determined in favor of plaintiff, the court in equity will retain jurisdiction to give complete relief.[9]

Were we to assume that the court should not have considered the evidence produced by Defendants in answer to the Plaintiff's Motion to Produce on the issue of damages, Plaintiff suggests there was ample evidence other-

---

8. 1. Breach of contract for sale and distribution of speedometer.
 2. Breach of contract of non-competition.
 3. Breach of written contract for secrecy.
 4. Violation of contract with respect to trade secrets.
 5. Violation of fiduciary relationship.

9. "Defendants labor under the impression that their liability is limited entirely to damages resulting from a breach of contract. In this they are mistaken for in the complaint it is charged, and as we have heretofore shown, that the evidence established that defendants violated their confidential and fiduciary relationship, as well as their contractual. They all have been found guilty of being coconspirators in a plan to injure plaintiff and appropriate its property to their own use and ben-

efit, and *equity having acquired jurisdiction, it retains jurisdiction to give such complete relief as the facts require."* (citations omitted) (emphasis added) *Hyman, supra,* 233 P.2d at 1007.

The court in *Hyman, supra* at 1008 went on to state:

"It is concededly impossible for plaintiff to produce competent evidence to show with a mathematical exactitude just what its loss was in dollars and cents by reason of defendant's business methods. However, that fact alone does not deprive plaintiff of its right to damages as is contended by defendant. In this case plaintiff is entitled to damages in an amount which it would have realized from the sale of chlordane at reasonable prices except for the wrongful and deliberate interference of defendants."

**458**

wise to support the District Court's decision in Plaintiff's Exhibits WWWWW and XXXX, and Defendants' Exhibits 207 and 210A, 210B and 210C. While that may well be true, we are not required to determine that point, because we are not convinced it was error for the trial judge to consider Defendants' response to the said Motion to Produce, hereinabove discussed. In fact, it is the better practice. Sinclair Refining Co. v. Jenkins Petroleum Processing Co., 289 U.S. 689, 53 S.Ct. 736, 77 L.Ed. 1449 (1933).[10]

## VI. WAS INJUNCTIVE RELIEF APPROPRIATE?

 Appellants urge the grant of damages against them, plus the injunctive relief granted against them, result in double damages. This may well be the result if the damages in a case are limited solely to breach of contract. Thus the citation in Milgrem, Trade Secrets § 7.08[1][a] at page 7–59, is applicable to a simple breach of contract case, both by case law and logic, and usually by its express terms, but a different rule is expressed where other principles are involved, as here exist. Milgrem, Trade Secrets, § 7.08[1][b] —Misappropriation of Trade Secrets:

"[b]—Injunction Against Process or Product. Misappropriation of a process, formula or other trade secret matter used in the manufacture or preparation of a product is generally sanctioned by a restraint on the use of the process, formula or other trade secret. If, however, the secret is unextricably connected with defendant's manufacture of the product the court may enjoin defendant from making the product itself."

*Cf. also* Julius Hyman v. Velsical, *supra*; 38 A.L.R.3d 572, 574 (1971).

We find the injunctive relief granted was permissibly appropriate.

## VII. MOTION FOR NEW TRIAL

 We are satisfied the trial court committed no error in denying Appellants' Motion for a New Trial, or a Partial New Trial, on the ground of Newly Discovered Evidence. Such a determination is not particularly favored by the courts, and rests largely and almost wholly within the sound judicial discretion of the trial court. Whether the newly discovered evidence would be likely to change the result of the District Court's decision is one peculiarly within the determination of but one man —the trial judge. The mere fact one Brown did not consider the Kodekey design "in any way secret or unique" would not necessarily be material evidence for and by the court under the facts of this case. (*See* (a) discussion *supra* under alleged errors I, II and III; (b) *Callman, supra* at § 53.3(e) p. 404, and (c) *Fairchild Engine & Airplane*

---

10. "The remedy of discovery is as appropriate for proof of a plaintiff's damages as it is for proof of other facts essential to his case. (*Id.*, p. 693, 53 S.Ct. p. 737.)

"There are times when a suit is triable in separate parts, one effecting the right or liability, and the other effecting the measure of recovery. In suits of that order a discovery as to damages will commonly be postponed till the right or liability has been established or declared. (citations omitted)

". . . As a general thing it will be useless to decree it any earlier and may even be oppressive. 'The principle of judicial parsimony' (L. Hand, J., in Pressed Steel Car Co. v. Union Pacific Railroad Co., *supra* [240 F. 135], if nothing more condemns a useless remedy. This division of the trial into stages or installments will happen oftenest in suits in equity, though it is not unknown in actions at law where a jury has been waived. In equity it is common practice. Thus, a suit to establish a partnership or to restrain the infringement of a patent culminates, if successful, in an interlocutory decree, which will be followed by an accounting and a discovery of documents. *In these and like cases*, the accounts will not be probed until the right has been adjudged." (emphasis added) *Id.* at 693–694, 53 S.Ct. at 737–738. "It is all a matter of discretion." *Id.* at 697, 53 S.Ct. at 739. *Cf. also* 4 J. Moore Federal Practice ¶ 26.56(5) (1972).

Corp. v. Cox, 50 N.Y.S.2d 643, 657 (Sup.1944) at key paragraph 19, p. 656, 657.) [11]

The judgment against Defendants is in all respects

Affirmed.

11. "So here, 'breach of faith and reprehensible means of learning another's secret' is the issue. To lose sight of everything else in pursuit of 'prior art'—'the kind of novelty and invention which is a requisite of patentability'—is to become a fugitive from the premier if not the single issue to be apprehended and solved.

"The defendant's reply that what he proposed to do does not concern a 'secret' is contradicted by his own conduct and words. From the mass of testimony the transcendent fact emerges that the plaintiff's process succeeded where others failed. No one else achieved the practical results these plaintiffs achieved. To retort that others might or could have done it, or were on the same track, does not alter or weaken the fact that the plaintiffs did do it. The plaintiffs' process 'clicked'

. . . .

"[19] It is quite manifest that after this litigation was projected, the defendant commenced digging in the field of 'prior art' to ascertain what had been done and written about bonding aluminum with ferrous metals. Concededly, the field was not entirely virgin. But the plaintiffs' expenditure of time and money brought results not reached by others. Once we conclude that the work done under Cox's supervision was confidential, and that Cox threatens to breach the confidence, all else is of subordinate importance. As Mr. Justice Holmes succinctly said in E. I. DuPont de Nemours Power Co. v. Masland, *supra*, 244 U.S. [100] page 102, 37 S.Ct. [575], page 576, 71 L.Ed. 1016:

" * * * Whether the plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied, but the confidence cannot be. Therefore the starting point for the present matter is not property or due process of law, but that the defendant stood in confidential relations with the plaintiffs, or one of them. These have given place to hostility, and the first thing to be made sure of is that the defendant shall not fraudulently abuse the trust reposed in him."