KUBIK, INC. v HULL

1. TORTS—TRADE SECRETS—DEFINITION.

A trade secret consists of any valuable formula, pattern, device, process or other information used in one's business which gives the possessor a competitive advantage over those who do not know or use the information.

2. TORTS—TRADE SECRETS—SECURITY MEASURES.

Evidence that sufficient measures have been taken to guard the secrecy of information and preserve its confidentiality is necessary for the information to be a trade secret.

3. TORTS—TRADE SECRETS—PUBLIC INFORMATION.

The term "trade secret" does not encompass information which is capable of being acquired by competitors or the general public without undue difficulty or hardship.

4. TORTS—TRADE SECRETS—ANALYSIS OF CASES.

The first analytic step in any trade secret action is to determine whether the information that equity is called upon to protect is, in fact, a trade secret.

5. TORTS—TRADE SECRETS—PREVENTION FROM DISCLOSURE—INTENT—KNOWLEDGE.

To warrant a finding that specific information is secret, it must be established that the possessor intended, and the employee or another person to whom the information was disclosed under-

---

REFERENCES FOR POINTS IN HEADNOTES

[1–9, 12] 55 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade Practices § 704 *et seq.*

74 Am Jur 2d, Trademarks and Tradenames § 141.

[10] 42 Am Jur 2d, Injunctions § 112.

55 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade Practices § 711.

[11] 55 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade Practices § 708.

Former employee's duty, in absence of express contract, not to solicit former employer's customers or otherwise use his knowledge of customer lists acquired in earlier employment. 28 ALR3d 7.

stood or should have understood, that the information was not to be indiscriminately made available to third parties or to the public generally.

6. TORTS—TRADE SECRETS—DETERMINATION OF SECRECY—FACTORS CONSIDERED.

Factors to be considered in determining whether specific information is secret include (1) the existence or absence of an express agreement restricting disclosure, (2) the nature and extent of security precautions taken by the possessor to prevent acquisition by unauthorized third parties, (3) the circumstances under which the information was disclosed by the possessor to the employee to the extent that they give rise to a reasonable inference that further disclosure, without consent, is prohibited, and (4) the degree to which the information has been placed in the public domain or rendered readily ascertainable by third parties through patent applications or unrestricted product marketing.

7. EQUITY—TORTS—TRADE SECRETS—CONFIDENTIAL RELATIONSHIPS— PROPERTY RIGHT.

Equitable intervention in trade secrets cases has as its purpose the protection of confidential relationships rather than the safeguarding of some nebulous "property right" in the information.

8. TORTS—TRADE SECRETS—PUBLIC DISCLOSURE—PRODUCT MARKETING —CONFIDENTIAL RELATIONSHIP—MISAPPROPRIATION—LIABILITY.

The view that public access to alleged trade secrets by virtue of product marketing does not affect the liability of one who misappropriates the information during the course of a confidential relationship is analytically unsound, because even a confidential or fiduciary relationship cannot, standing alone, render information secret which has been disclosed to the world by product marketing.

9. TORTS—TRADE SECRETS—PUBLIC DISCLOSURE—FACTORS CONSIDERED.

The sale of hydrostatic drive units by a plaintiff manufacturer did not constitute a public disclosure of a design modification of an integral part of the units where only 22 of the units were marketed, the modification was part of an integrated package not easily subject to observation and examination, both plaintiff and defendant agreed that it would be most difficult to obtain a marketed unit from a customer for inspection, reverse engineering of the unit would take at least 30 hours and perhaps as

long as four months, and the record discloses that the plaintiff instructed defendant that the design information was proprietary in nature and not to be transmitted.

10. Damages—Injunction—Torts—Trade Secrets—Product Marketing—Harm Caused—Appropriate Remedies.

Assessment of damages is the appropriate remedy and should fully compensate a plaintiff for the loss occasioned by defendant's unlawful disclosure and use of plaintiffs' trade secrets and a permanent injunction to prevent defendants from continuing to use plaintiffs' trade secrets and from the manufacture and sale of hydrostatic drive equipment involved in the litigation, is inappropriate where a number of units utilizing the plaintiffs' design have been marketed commercially, and the harm caused to the plaintiffs by the defendant's misappropriation is thus diminished to the extent that other competitors could legally duplicate the equipment; a permanent injunction prevents the defendants from doing that which others in the field can lawfully do, and is punitive, rather than compensatory.

11. Injunction—Employer and Employee—Former Employee—Customer Lists—Misappropriation.

An injunction preventing a former employee, now a competitor, from contacting customers of his former employer is inappropriate where there is no evidence that he physically misappropriated tangible customer lists owned by the employer.

12. Torts—Trade Secret—Mathematical Formula—Disclosure—Acceptance.

A unique mathematical formula used to determine the speed at which a conveyor system will have to move to transport products over a given distance within a specified time is not entitled to trade secret protection where the plaintiff, who developed the formula, accepted the defendant's disclosure of the formula to customers.

Appeal from Oakland, Arthur E. Moore, J. Submitted Division 2 January 11, 1974, at Detroit. (Docket No. 16489.) Decided November 6, 1974. Leave to appeal applied for.

Complaint by Kubik, Inc. and Philip A. Kubik against James S. Hull, P.S.I. Hydraulics, Walter Shank and William Phillips for an injunction against misappropriation of trade secrets. Injunc-

tion granted. Defendants appeal. Reversed and remanded.

*Weiner, Basile & Weintraub, P. C.,* for plaintiffs.

*Fisher, Krass, Young & Gerhardt,* for defendants.

Before: McGregor, P. J., and J. H. Gillis and O'Hara,* JJ.

McGregor, P. J. This equitable action was instituted on January 8, 1970, when plaintiffs filed a complaint in Oakland County Circuit Court, alleging that defendant Hull had misappropriated plaintiffs' trade secrets in breach of a confidential relationship and, further, that the above named defendants conspired to and did compete against plaintiffs through the use of such trade secrets. A judgment was entered on January 24, 1973, permanently enjoining defendants from the continued use of plaintiffs' trade secrets and, in addition, from the manufacture and sale of the hydrostatic drive equipment involved in this litigation. From this judgment, defendants appeal as of right.

Plaintiff Kubik, Inc. is a manufacturer of hydrostatic drive units for use in transfer and conveyor systems. It developed a unit known as the Kubik Hydradrive which is, in essence, a modification of the basic hydrostatic transmission used in the automation industry, developed by the Vickers division of the Sperry-Rand Corporation. The primary modification consists of a hydraulic cylinder and manifold which improves control of the basic hydrostatic unit as a whole and, apparently, repre-

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

sented in 1969 a new development in the hydro-
static drive industry.

Defendant Hull was employed as a salesman and
vice-president for plaintiff corporation, beginning
December 1, 1967. Although he had previously
worked as a salesman in the hydraulics field, he
had no prior experience with hydrostatic drive
units. In September, 1969, defendant Hull notified
plaintiff that he intended to leave his employment,
and he did so, on November 22, 1969. Prior to this
termination, in September of 1969, defendant Hull
entered into an oral agreement with defendant
Phillips, president of PSI Hydraulics, to make
hydrostatic drive units. According to that agree-
ment, Hull would supply Phillips and PSI, Inc.
with technical information concerning the design
and manufacture of the units, PSI would provide
the necessary construction facilities and personnel,
and Hull's future corporation, the Melvin Corpora-
tion, would act as the sales agent for PSI. The
profits from the manufacture and sale of the units
would be divided equally between the Melvin Cor-
poration and PSI.

Hull testified that he did not divulge any infor-
mation pertaining to controls on the Kubik Hydra-
drives prior to his leaving plaintiff's employ. He
did testify, however, that in October, 1969, he gave
pricing information to Phillips and PSI to enable
PSI to provide a competitive quote on a hydro-
static drive to the Jervis B. Webb Company, a
prospective buyer. Hull supplied the quote he had
made to Webb on behalf of Kubik, Inc., and the
Webb contract was subsequently let to PSI.

Testimony at trial also indicated that on Novem-
ber 18, 1969, Phillips visited Kubik, Inc. to pick up
a "piece of equipment". The equipment was a
standard unmodified Vickers Drive, purchased

through plaintiff, an authorized Vickers distributor. The drive was picked up for PSI by Phillips, "on behalf" of defendant Walter Shank, of Tru-Tech Corporation. (Defendant Shank is actually an officer of PSI and ordered the purchase on behalf of that corporation. Tru-Tech's name was used on the purchase order to conceal from Kubik the fact that the drive was being purchased by Phillips. PSI purchased the standard drive with the intent subsequently to modify it.)

During his visit to the plant, Phillips was shown a hydrostatic drive in operation by defendant Hull.

Testimony also indicated that when he left Kubik, Hull took with him several drawings made by the Vickers Corporation which were the property of plaintiff, without plaintiff's permission, and never returned them. Subsequent testimony disclosed that Hull believed that he used one of the drawings in designing a manifold. Apparently, however, the manifold was a general manifold used in the standard Vickers model, in contrast to the specific Kubik modification.

It is to be noted at this point that, other than the misappropriation of the Vickers drawings, there is no evidence that defendant Hull physically took any other tangible property belonging to plaintiffs. Hull testified that he turned over everything to plaintiff—except the Vickers drawing—upon the termination of his employment.

Defendant Hull also testified that, after leaving Kubik, he divulged information to defendant Phillips on the controls and other aspects of the Kubik hydrostatic drive units.

Phillips testified that Hull supplied him with both control and other information regarding the Kubik hydrostatic drive units. In particular, Phillips stated that in November, 1969, Hull supplied

him with a list of components, "such as hydraulic cylinders, flow control valves, directional valves, etc. to be used with the drive". Hull also prepared a drawing of the "type of control that we intended to furnish the industry, not Kubik's control. This drawing was Mr. Hull's and myself's, for what little I contributed, our design, not Kubik's design". Hull testified that this drawing was prepared by one Ray Schihl through the use of a "photograph" and "the standard Vickers drawing for the Vickers hydraulic book we sell".

It appears that the drawings which Hull took from Kubik were not used by Schihl to prepare his drawing. Apparently, Hull picked up the Vickers drawing book personally from Vickers. As noted previously, however, Hull believed that he may have used one of the stolen drawings in designing the unit to be manufactured by Phillips.

Defendant Phillips testified that he requested the information from Hull to enable him to build a hydrostatic drive unit. He believed that he could have built the unit that was finally developed without the information that was provided— through reverse engineering—but testified that it was Hull's "duty" to supply the technical information learned at Kubik under their September agreement to build hydrostatic drive units. At one point in the testimony the following exchange occurred between Phillips and plaintiff's counsel:

"*Q.* Was any of the information concerning the Kubik Hydradrive given to you by Mr. Hull?
"*A.* Yes.
"*Q.* Did you request him to give you this information?
"*A.* Yes.
"*Q.* What was your reason for requesting this information?

"*A.* I wanted to know as much about it as possible in order to build a similar drive.

\* \* \*

"*Q.* Was it necessary even to know what the Kubik Hydradrive was, could you have gone to some other company in the field and looked at this equipment?

"*A.* At that time, Mr. Kubik was the only one involved in building that particular drive.

"*Q.* That is correct. In fact, as Mr. Hull has testified—

"*The Court:* Well, let's not have your testimony. Your next question please.

"*Q. (By Mr. Weiner, continuing):* Mr. Phillips, were you in the courtroom when Mr. Hull testified that Kubik, Inc. had a unique position in the industry?

"*A.* Yes.

"*Q.* Was Mr. Hull correct in that testimony?

"*A.* I believe so.

"*Q.* So it is your feeling that Mr. Kubik did have a unique position in the industry?

"*A.* Yes.

"*Q.* To the extent that no one else could supply that equipment at that particular time?

"*A.* Yes.

"*Q.* Did this unique position in the industry give Kubik, Incorporated, an advantage over his so-called competitors or competition?

"*A.* Yes.

"*Q.* Would you consider that unique position and competitive edge a valuable asset of Kubik, Incorporated?

"*A.* Yes.

"*Q.* In requesting this information, as you did from Mr. Hull, were you in fact trying to obtain this valuable asset from Kubik, Incorporated?

"*A.* Yes."

It should be added that the hydrostatic drive unit eventually developed by Phillips and Hull contained both a hydraulic motor and hydraulic cylinder. This is apparently the significant and

distinguishing characteristic of the Kubik Hydradrive involved in this litigation.

Thus far, it can be seen that testimony at trial establishes that defendant Hull conveyed to Phillips the technical information concerning the Kubik Hydradrive unit, which was obtained while Hull was in the employ of plaintiff. Hull, in addition, took Vickers Corporation's drawings, belonging to plaintiff, and apparently used them to some extent in designing hydrostatic drive units for defendant Phillips and PSI. Hull furthermore provided Phillips with a quote previously furnished to the Webb Company by Kubik, Inc., which enabled Phillips and PSI successfully to bid for the Webb contract.

Although additional alleged trade secrets are involved in this action and will be discussed hereafter, the foregoing facts establish the basis of plaintiffs' action against defendants, specifically, that allegedly confidential information concerning Kubik Hydradrives was conveyed by defendant Hull to defendant Phillips for the purpose of manufacturing hydrostatic drive units. Pertinent additional facts will be discussed as we deal with the issues raised on appeal.

At the conclusion of trial, the court issued findings of fact which included:

"The plaintiff, Kubik, Inc., is a design and manufacturing company for hydraulically-controlled hydrostatic drive units which are components in transfer and conveyor systems, to which there is limited access. The unit designed and manufactured by the plaintiff is sold as an integrated package, hereinafter referred to as the Kubik Hydradrive, employing a unique manifold with which the various components of the drive unit are hydraulically connected.

\* \* \*

"Prior to the plaintiff's undertaking their activities in fabricating and supplying such integrated packages, such hydrostatic drive units were non-existent. To date, except for the plaintiff corporation, the only other sources of such units are those parties who have been associated with the defendant Hull.

\* \* \*

"The plaintiffs developed, through their own efforts, secret information including methods of analysis of kinematic problems, unique hardware, customer lists and information, pricing information and lists, experimental machinery, and compiled detailed drawings and design assembly information, \* \* \* all such secret information being available to no one other than those in relationship of confidence with the plaintiff.

\* \* \*

"Prior to the defendant Hull leaving the employ of the plaintiff Kubik, Inc., the defendant Hull compiled, schemed to use, and disclosed to the other defendants, the secret information of the plaintiffs which was related to defendant Hull in confidence.

"The defendants Phillips, Shank, and PSI conspired with the defendant Hull to disclose the secret information which the defendant Hull garnered while serving in his fiduciary capacity with the plaintiffs. Such information was disclosed while defendant Hull was still in the employ of the plaintiff corporation."

In addition, the trial court issued conclusions of law. The court determined that the plaintiffs possessed trade secrets under Michigan law and that the defendant Hull took this information "not only for his own benefit but also for the benefit of the other defendants who thereafter employed this information to the detriment of the plaintiffs". Accordingly, the court determined that the other defendants were equally liable with defendant Hull.

On January 24, 1973, the trial court awarded plaintiffs:

"A. A judgment permanently enjoining all of the defendants, individually and jointly, their agents, successors, assigns, and all others in relation therewith from making, using, and selling hydrostatic drive equipment or components thereof, involved in this litigation. This is the only meaningful and enforceable injunctive relief which this court can impose. *Head Ski Co, Inc v Kam Ski Co, Inc,* 158 F Supp 919; 116 US P Q 242 (D M, 1958), *ILG Industries, Inc v Scott,* 49 Ill 2d 88; 273 NE2d 393; 171 US P Q 371 (1971).

"B. A judgment permanently enjoining all of the defendants, individually and jointly, their agents, successors, assigns, representatives, and others in relation therewith, from using, directly or indirectly, in any fashion any and all of plaintiffs' trade secrets which form the subject matter of this lawsuit, including the method of analysis identified as "Total Equivalent Time," customer lists and other information relating to selling of hydrostatic drive units, pricing lists and other pricing information relating to pricing for hydrostatic drive units, design assembly information relating to hydrostatic drive units, manifolds and manifold design information relating to hydrostatic drive units, technical drawings relating to the design and/or assembly of hydrostatic drive units, and detailed manufacturing drawings for hydrostatic drive units, involved in this litigation. *Head Ski Co, Inc v Kam Ski Co, supra.*"

To avoid unnecessary confusion and repetition, we have consolidated and restated the issues raised by defendant on appeal.

The threshold question before us is whether the trial court properly determined that the information allegedly conveyed by defendant Hull to defendant Phillips constituted "trade secrets" of plaintiff.

The term "trade secrets" has come to embody a wide spectrum of varying commercial and technical information. For that reason, it is susceptible to no precise definition. There are, however, a number of Michigan cases which serve to highlight

the factors relevant in determining whether a particular process, device or operation constitutes a "trade secret" and, hence, merits equitable protection in appropriate circumstances.

In *Glucol Manufacturing Co v Schulist,* 239 Mich 70, 75; 214 NW 152, 153 (1927), the court stated:

> "The term trade secret, as usually understood, means a secret formula or process not patented but known only to certain individuals using it in compounding some article of trade having a commercial value, and does not denote the mere privacy with which an ordinary commercial business is carried on.
>
> \* \* \*
>
> "It is a 'plan or process, tool, mechanism or compound known only to its owner and those of his employees to whom it is necessary to confide it'."

In *Manos v Melton,* 358 Mich 500, 508; 100 NW2d 235 (1960), our Supreme Court set forth further guidelines:

> " \* \* \* [T]his Court has also recognized that the law does not provide protection for knowledge which is common property in the trade, or for an idea which is well-known or easily ascertainable. *Russell v Wall Wire Products Co,* 346 Mich 581; 78 NW2d 149 (1956); *Insealator, Inc v Wallace,* 357 Mich 233; 98 NW2d 643 (1959).
>
> "Ellis on Trade Secrets, § 239, pp 324–325, recognizes seven factors for consideration as to the existence of a legally protectible trade secret:
>
> " '(1) The amount of labor and money expended. Those factors rather than brilliance of conception or execution determine whether an idea or information is worthy of court protection.
>
> " '(2) The idea should be embodied or be capable of being embodied in concrete form to be protectible as a trade secret.
>
> " '(3) Trivial advances or differences in formulas or process operation are not protectible as trade secrets.

" '(4) The plaintiff must prove that he was in possession of the alleged trade secret at the time defendant is alleged to have obtained it from plaintiff or one of his employees.

" '(5) Where the alleged trade secret was known to the recipient prior to its disclosure to him, the recipient is free to use it.

" '(6) A trade secret may not be protected if it is known generally to the trade although not known to the recipient.

" '(7) Plaintiff must prove that secrecy has been maintained either by non-disclosure or disclosure in confidence.' "

The Restatement of Torts, § 757, Comment B, p 6, notes:

"An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) The extent to which the information is known outside of the business; (2) The extent to which it is known by employees and others involved in his business; (3) The extent of measures taken by him to guard the secrecy of the information; (4) The value of the information to him and to his competitors; (5) The amount of effort or money expended by him in developing the information; (6) The ease or difficulty with which the information could be properly acquired or duplicated by others."

From the foregoing, several generalizations can be made:

(1) A trade secret consists of any valuable formula, pattern, device, process or other information that is used in one's business and gives the possessor a competitive advantage over those who do not know or use the information.

(2) To be a trade secret, the information must, of necessity, be a *secret;* specifically, there must be evidence presented that sufficient measures have been taken to guard the secrecy of the information

and preserve its confidentiality. Such measures generally include either an express agreement between the employer and employee restricting or prohibiting disclosure by the latter to third parties; a disclosure by employer to employee in confidence or with a tacit understanding, inferable from the attendant circumstances, that the information is confidential; or security precautions utilized by the employer to insure that only a limited number of authorized individuals have access to the information.

(3) The term "trade secret" does not encompass information which is readily ascertainable, i.e., capable of being acquired by competitors or the general public without undue difficulty or hardship.

Since a number of alleged "trade secrets" are involved in this appeal, we will discuss each separately, in light of the factors enumerated above.

## MANIFOLD AND MANIFOLD DESIGN INFORMATION RELATING TO HYDROSTATIC DRIVE UNITS

In his "Conclusions of Law," the trial court stated:

"Finally, we turn to the last alleged trade secret—the manifold design and the manifold, per se. The testimony elicited at trial has shown beyond any doubt that the manifold developed by the plaintiffs and employed in the design, assembly and manufacture of a Kubik Hydradrive is unique. The manifold design and the manifold were kept in confidence by the plaintiffs. The detailed drawings for the manifold were retained by the manufacturer thereof solely for the benefit of the plaintiffs. The defendants misappropriated same, and the defendants' own testimony completely establishes this fact. The manifold and its design were an improvement

which was a secret and was of value. Thus, it was a trade secret."

It is apparent from both our review of the testimony elicited at trial and the trial court's findings that the manifolds and manifold design information meet the first requirement discussed above, i.e., they are a formula or device developed by the plaintiff and used in his business that gives him a competitive advantage over those who do not possess the information. It is clear that the manifold in question is the primary distinguishing feature between the Kubik Hydradrive and the standard unmodified Vickers hydrostatic drive unit. The modification improves the control of the units by using a "variable displacement hydraulic pump to operate, through a closed loop arrangement, a hydraulic actuator that drives a load and which attains direction of reversing by a directional valve". Such use of a directional valve, with a hydraulic motor and *hydraulic actuator* was apparently unique in the industry in 1969. Indeed, defendant Phillips recognized that plaintiffs' improvements on the standard Vickers unit were "unique", and gave plaintiff a competitive advantage.

Further, plaintiff Kubik, a former employee of the Vickers division of Sperry-Rand, testified that the modification was developed over a considerable period of time at a cost of between ten and twenty thousand dollars. On the basis of the foregoing testimony, the trial court could properly conclude that the manifolds and manifold design information were valuable devices, developed by plaintiff and used in his business and gave him a competitive advantage over others in the industry.

With respect to the question of confidentiality, i.e., steps taken by the plaintiff to insure the secrecy of its hydrostatic drive unit modification,

the case is much closer. At trial, defendant Hull
testified:

"Mr. Kubik didn't want me to tell anyone anything
* * * He wanted everything secret."

Plaintiffs' counsel asked plaintiff Kubik the fol-
lowing question:

"What instructions, if any, did you give to Mr. Hull
as to information he would be permitted to convey to
customers?"

Plaintiff Kubik responded:

"Told Mr. Hull that the thing that was necessary, the
only thing that was necessary in my judgment to sell
this product was to instill an enthusiasm in the cus-
tomer, showing that we had a new idea and a new way
to go, describe the basic function of the unit and what it
would do. That was all that generally would be re-
quired, and based on my experience, that's all that was
required.
  "We didn't have to get down into the engineering
detail with the customer. We had to tell him, make a
recommendation as to what size unit he should use,
what gear reductions he should use, and giving basic
function of the unit and that was all."

It is evident from the foregoing that there was
little evidence presented at trial that would indi-
cate that plaintiff took specific steps to keep his
information secret and insure its confidentiality.
In contrast to other Michigan cases involving dis-
closure of allegedly confidential information, there
is no evidence that an express agreement existed
between defendant Hull and plaintiff to keep this
information secret. See, for example, *Shwayder
Chemical Metallurgy Corp v Baum,* 45 Mich App
220; 206 NW2d 484 (1973); *Glucol Manufacturing*

*Co, supra; Manos v Melton, supra.* Nor, for that
matter, does the evidence reveal the sort of pre-
cautions taken by plaintiff in *Dow Chemical Co v
American Bromine Co,* 210 Mich 262; 177 NW 996
(1920). Since there was neither an express agree-
ment requiring secrecy nor evidence of a signifi-
cant security precaution taken to avoid disclosure,
plaintiff asserts that the information concerning
the manifold design was given to Mr. Hull "in
confidence" by virtue of the fiduciary relationship
then existing between the parties. Since the un-
contradicted evidence demonstrates that Mr. Hull
utilized that information in breach of the trust
reposed in him by Kubik, for his own private gain
to the detriment of his employer, plaintiff con-
cludes that a court of equity may properly enjoin
Hull's continuing breach of his fiduciary duty. This
line of argument brings us to the crucial aspect of
the present appeal, for, as the evidence at trial
also undeniably demonstrates, plaintiff Kubik mar-
keted at least 22 of his hydradrives prior to de-
fendant's employment. Further, the parties agreed
that the specific Kubik modification of the stan-
dard Vickers hydrostatic drive unit could be "re-
verse engineered" through the use of any of the
marketed drives. Estimates as to how long this
process would take varied. Defendant Phillips tes-
tified that he could have reverse engineered the
product in 30 hours. Plaintiff Kubik, however,
testified that it would take 2 to 4 months to
reverse engineer the modification. The crucial
question, therefore, becomes what effect public
disclosure through product marketing has on the
alleged trade secret status of information conveyed
to an employee during the course of a confidential
relationship.

The record before us vividly demonstrates the
trial court's recognition of this vital question. His

conclusions of law reflect that awareness and embody his scholarly effort to resolve it in accordance with established equitable principles. In light of the novelty of the issue, the significance of its proper resolution and the clarity with which the trial judge has stated his views, we deem it appropriate to quote at some length from the relevant portions of his conclusions of law:

"Even conceding, as the Defendants contend, that all the trade secret information, acquired by the Defendants could *have been* legally obtained through investigation, research and the like, this does not negate the secrecy of the information as to the present Defendants, nor does it negate their culpability, for they failed to employ legal, proper and fair means in learning these trade secrets. As was stated in *Smith v Dravo Corp,* 203 F2d 369, 374; 97 USPQ 98, 102 (CA 7, 1953):

" 'In *Pressed Steel Car Co v Standard Steel Car Co,* 210 Pa 464; 60 A 4 (1904), plaintiff sought to protect its secret construction design for railroad cars. These plans had been obtained by defendant through a known breach of confidence. It was urged by defendant that because it could have obtained the design from an inspection of the car (which was in public use) its use of knowledge gained through improper means would be condoned. In short, defendant suggested, as does defendant here, that the existence of a lawful means of acquiring the information precluded recovery for the employment of unlawful means. The Court said:

" ' " * * * these engineers and draftsmen * * * should have been able to measure the cars made by the company, and to produce in a short time detailed and practical drawings from which the cars could be constructed. They did not do this, for the very obvious reason that blueprints of drawings were available and were accurate * * * .' "

" 'The Court then affirmed recovery for the plaintiff.

*        *        *

" 'Confidential business information is not given protection merely as a reward to its accumulator. If the

creator is entitled to reward, it is available to him in the patent and copyright statutes. Nims, *Unfair Competition and Trade Marks,* Sec 142 p 406–407. Instead our function is that of condemning 'the employment of improper means to procure the trade secret'. *Restatement, Torts,* Sec 757, comment. Those who gain their information improperly are brought to book in recognition of 'the general principle that intentionally inflicted harm is actionable unless privileged'. *Protection and Use of Trade Secrets,* 64 Harv L Rev 976 (1951).

" 'It is unquestionably lawful for a person to gain possession, through proper means, of his competitor's product and, through inspection and analysis, create a duplicate, unless, of course, the item is patented. But the mere fact that such lawful acquisition is available does not mean that he may, through a breach of confidence, gain the information in usable form and escape the efforts of inspection and analysis.

" 'The fact that a trade secret is of such a nature that it can be discovered by experimentation or other fair and lawful means does not deprive its owner of the right to protection from those who would secure possession of it by unfair means." ' Nims, *Unfair Competition and Trade Marks,* Sec 148, p 419.

" 'This text citation is the distillate of many judicial decisions, Thus, in *A. O. Smith Corp v Petroleum Iron Works Co,* 73 F2d 531, 538–539 (CA 6, 1934), the court said: "The mere fact that the means by which a discovery is made are obvious * * * cannot * * * advantage the competitor who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price in labor, money or machines expended by the discoverer." And in *Shellmar Products Co v Allen-Qualley Co,* 36 F2d 623, 625 (CA 7, 1929), this court announced: 'Whether it would have been possible to have discovered and purchased the Olsen patent, without the information disclosed to appellant in confidence, it is not necessary to determine, because it is clear from the record that by a breach of confidence the information was disclosed and used as a basis for the search that was made.' And in *Tabor v Hoffman,* 118 NY 30; 23 NE 12 (1889), this is the language: "But because this discovery may be possible

by fair means, it would not justify a discovery by unfair means." '

"The doctrine of *Smith v Dravo* is in complete accord with the other jurisdictions which have considered the issue of fair versus unfair acquisition of a trade secret. See, inter alia, *Heatbath Corp v Ifkovits,* 117 Ill App 2d 158; 254 NE2d 139; 164 USPQ 537 (1970). *Franke v Wiltschek,* 209 F2d 493; 99 USPQ 431 (CA 2, 1953); *Standard Brands, Inc v Zumpe,* 264 F Supp 254; 152 USPQ 731 (ED La 1967); *Sperry Rand Corp v Rothlein,* 142 USPQ 172 (DC Conn, 1964); *E. I. duPont de Nemours & Co, Inc v Christopher,* 431 F2d 1012; 166 USPQ 421 (CA 5, 1970).

\* \* \*

"The Defendants contend that the information which they obtained directly from the Plaintiffs *could have been* obtained by *reverse engineering.* However, even if this is true, this does not negate their liability because they admittedly and purposefully avoided using this procedure, i.e., Defendants admit that they did *not* reverse engineer. *Tabor v Hoffman, supra.*

"The Defendant Phillips has testified under oath:

" *'Q. (by Mr. Weiner):* It is lawful if someone independently reverse engineers, buys a product, and reverse engineers it, that is lawful, you do understand that?

" *'A. (by defendant Phillips):* To the best of my knowledge, it is lawful, yes.

" *'Q.* And you didn't take that lawful route, you didn't do that, did you?

" *'A.* I did not do it that way, no.

" *'Q.* You took a short cut, is that correct?

" *'A.* That is true.

" *'Q.* And that short cut was through the information supplied to you by Kubik's employee, Mr. Hull, is that right?

" *'A.* That is true.'

"Further testimony by Defendant Phillips himself attesting to the fact that the Defendants did not employ reverse engineering can be found in the August 18, 1972 Transcript, page 83, lines 11–18; page 85, lines 18–21; and page 159, lines 13–19.

"Assuming arguendo, but not conceding, that one or more of Plaintiff's trade secrets might have been susceptible of being ascertained by reverse engineering, the question of whether or not liability attaches for misappropriation of such a trade secret is a question synonymous with the issue of 'fair versus unfair' acquisition. The Courts have resoundingly resolved this issue by announcing that illegal and unfair acquisition of that which could have been legally obtained shall not absolve the tortfeasor for his wrongdoing. See paragraph 14, *supra.*

"Imposing liability for failure to invoke proper business procedures is not a means for rewarding the developer of the trade secret. Rather, it is a means for punishing the wrongdoer for failure to pursue the proper business ethic."

Having carefully reviewed both the record before us and the authorities cited above by the trial court, we are persuaded that his ultimate determination—that the manifold design information constituted a trade secret—was correct. However, we do not subscribe to the views implicit in the approach which he adopted, specifically, that unrestricted product marketing is of little importance in either determining trade secret status or fashioning an appropriate remedy.

In our judgment, the first analytic step in any trade secret action is to determine whether the information equity is called upon to protect is, in fact, a trade secret. *Insealator, Inc v Wallace, supra,* p 250, "Before there can be a betrayal of anything in the nature of a trade secret, there must be a secret." *Russell v Wall Wire Products Co,* 346 Mich 581, 586; 78 NW2d 149 (1956); *Van Products Co v General Welding and Fabricating Co,* 419 Pa 248, 268; 213 A2d 769; 30 ALR3d 612, 628 (1965), "The starting point in every case of this sort is not whether there was a confidential

relationship, but whether, in fact, there was a trade secret to be misappropriated."

In determining whether the information involved in a given case is "secret," and thus arguably entitled to equitable protection, it is essential that the circumstances attending its possession and disclosure be closely examined. Secrecy is not, after all, an entity existing independent of the thoughts or acts of men; rather, information is "secret" only to the extent that those who possess it choose to treat it so. Accordingly, to warrant a finding that specific information is "secret," it must be established that the possessor intended, and the employee (or other person to whom the information was disclosed) understood or should have understood that the information was not to be indiscriminately made available to third parties or the public generally. Relevant factors to be considered include (1) the existence or absence of an express agreement restricting disclosure, (2) the nature and extent of security precautions taken by the possessor to prevent acquisition of the information by unauthorized third parties, (3) the circumstances under which the information was disclosed by the possessor to the employee to the extent that they give rise to a reasonable inference that further disclosure, without the consent of the possessor, is prohibited, and (4) the degree to which the information has been placed in the public domain or rendered "readily ascertainable" by the third parties through patent applications or unrestricted product marketing.

The approach adopted by the trial court, and supported by the authorities he cites, unduly emphasizes the parties' confidential relationship and neglects other criteria relevant in the determination of trade secret status. This emphasis is un-

doubtedly attributable to the fact that equitable intervention in trade secret cases has, as its purpose, the protection of confidential relationships rather than the safeguarding of some nebulous "property right" in the information. As one commentator has noted:

"Historically two principal justifications have been advanced for the protection of trade secrets: (1) the protection of a property right, and (2) the preservation of a confidential relationship with a person who has expended time and creative effort in developing new ideas. However, the Supreme Court laid the property right theory to rest in *E. I. duPont deNemours Powder Co v Masland* [244 US 100, 102; 37 S Ct 575; 61 L Ed 1016 (1917)], where it concluded that the property being protected was simply the 'secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith.' This left the confidential relationship as the sole basis for protection of trade secrets. In an oft-quoted phrase, Mr. Justice Holmes stated that "the property may be denied but the confidence cannot be.'" Note, *Trade Secrets Law After Sears and Compco,* 53 Va L R 356, 364 (1967) (Footnotes omitted.)

In this connection, our Supreme Court has stated:

"The essence of the wrong is the breach of confidence, the betrayal of the trust placed in the recipient. As phrased in 4 Restatement, Torts, § 757, p 4:
" 'The theory that has prevailed is that the protection is afforded only by a general duty of good faith and that the liability rests upon breach of this duty; that is, breach of contract, abuse of confidence or impropriety in the method of ascertaining the secret.'" *Russell v Wall Wire Products Co, supra,* 585–586.

Somewhat more expansively, the United States

Supreme Court has only recently had occasion to note that:

"The maintenance of standards of commercial ethics and the encouragement of invention are the broadly stated policies behind trade secret law." *Kewanee Oil Co v Bicron Corp,* 416 US 470; 94 S Ct 1879, 1886; 40 L Ed 2d 315, 325 (1974).

This repeated assertion—that equitable relief in trade secret cases is granted to foster the integrity of confidential relationships—has given rise to the view, adopted by the trial court here, that public access to alleged trade secrets by virtue of product marketing does not affect the liability of one who misappropriates the information during the course of a confidential relationship. That view is succinctly but forcefully articulated in *Franke v Wiltschek, supra,* p 495:

"Defendants argue that the heart of plaintiff's process was revealed by an expired patent, and that the improvements thereon were unpatentable applications of mechanical skill. This totally misconceives the nature of plaintiffs' right. Plaintiffs do not assert, indeed cannot assert, a property right in their development such as would entitle them to exclusive enjoyment against the world. Theirs is not a patent, but a trade secret. The essence of their action is not infringement, but breach of faith. It matters not that defendants could have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. The fact is that they did not. Instead they gained it from plaintiffs via their confidential relationship, and in so doing incurred a duty not to use it to the plaintiffs' detriment. This duty they have breached."

In our judgment, this approach is analytically unsound. Not because the relationship of the parties is irrelevant, but because even a confidential

or fiduciary relationship cannot, standing alone, render information secret which has been disclosed to the world by product marketing. It cannot be fairly disputed that much of what transpires during the course of such a relationship, particularly between employer and employee, is common knowledge, freely available to all who seek it. For equity to protect by injunction all information imparted to an employee by his employer would do violence to "the principle that an individual has the right to change his employment for whatever reason he wishes and the right to utilize his general skill, knowledge and experience for the benefit of his employer." *Allis-Chalmers Manufacturing Co v Continental Aviation and Engineering Corp,* 255 F Supp 645, 652–653 (ED Mich, 1966). To adequately and fairly protect the rights of both employer and employee, information which is truly "secret" in nature must be distinguished from that which is readily available to the public. That distinction cannot be based on simply the relationship existing between the parties at the time the employee acquired the information. Rather, it must be premised upon an understanding of the parties, that the information is not to be disclosed without restriction to third persons and a finding that it is not readily available to the public at large. To the extent that unrestricted product marketing, and the accompanying likelihood of reverse engineering evidences the absence of such an understanding and renders product design information readily available to the general public, we think it a crucial factor in the determination of trade secret status.

The question in this case, therefore, becomes whether the unrestricted public sale of at least 22 Kubik Hydradrives by plaintiff prior to defendant Hull's employment rendered the design informa-

tion readily ascertainable, *i.e.,* subject to discovery without undue effort or hardship. From a careful reading of the transcript, we think not. Our conclusion is based on a number of factors, including: (1) only 22 of the units were marketed; (2) the modification was part of an integrated package not easily subject to observation and examination; (3) both parties agreed that it would be most difficult to obtain a marketed unit from a customer for inspection; and (4) reverse engineering of the Kubik Hydradrive would take at least 30 hours and perhaps as long as 4 months. Under these circumstances, we cannot say that plaintiff's sale of the 22 units constituted a public disclosure of the manifold design information. Additionally, the record contains undisputed testimony that plaintiff instructed defendant that the design information was "proprietary" in nature and not to be transmitted indiscriminately to third parties. In light of these factors, we hold that the trial court correctly determined that the information concerning the design of plaintiff's manifold constituted an equitably protectable trade secret.

Conceding plaintiff's right to relief, there remains for our consideration the propriety of the remedy adopted by the trial court, a permanent injunction restraining defendants from "making, using, and selling hydrostatic drive equipment or components thereof, involved in this litigation".

We have already discussed the significance of product marketing in determining initially whether specific information constitutes an equitably protectable trade secret. Having concluded that the limited extent of marketing involved in this case did not constitute a public disclosure of the information so as to deny plaintiffs the right to relief, the question remains whether that market-

ing, however limited, narrows the scope of the appropriate remedy.

One view, originating with *Shellmar Products Co v Allen-Qualley Co,* 87 F2d 104 (CA 7, 1936), *cert den,* 301 US 695; 57 S Ct 923; 81 L Ed 1350 (1937), is that one who acquires secret information unfairly, *i.e.,* through a breach of a confidential relationship, may be permanently enjoined from its use even though members of the general public could have obtained the information fairly (by reverse engineering, inspection of an expired patent, etc.). The contrary rule, clearly stated in *Conmar Products Corp v Universal Slide Fastener Co,* 172 F2d 150, 155–156 (CA 2, 1949), is that permanent injunctive relief is inappropriate where the trade secret is available to members of the public, and that the relief granted should be limited to an award of damages or, at most, a temporary injunction. See generally, *Developments in the Law, Competitive Torts,* 77 Har L Rev 888, 958–959 (1964); Annotation, 38 ALR3d 572 *Propriety of Permanently Enjoining One Guilty of Unauthorized Use of Trade Secret from Engaging in Sale or Manufacture of Device in Question.* It is unnecessary to discuss at length the considerations which have prompted either rule. Briefly, it would appear that those courts adhering to the *Shellmar* rule seek primarily to encourage both higher standards of commercial conduct and inventiveness by preventing the use of trade secrets by those who acquire them through subterfuge or disloyalty. In contrast, those jurisdictions following the *Conmar* rule emphasize the importance of making the plaintiff whole by putting him in that position he would have occupied, had not the defendant misappropriated the trade secrets. Having considered both approaches, we think the *Conmar* rule prefer-

able, in that it is consonant with the basic tenet that equitable relief should bear some reasonable relationship to the extent of the injuries suffered by the plaintiff. Where, as in this case, the secret embodied in a tangible product is available to any member of the public, permanent injunctive relief grants the plaintiff that which he did not have before the misappropriation—the power to eliminate a competitor from the market.

In *Franke v Wiltschek, supra,* pp 503–504, Judge Frank discussed at some length the proper function of remedies in trade secret cases. We think that discussion pertinent here:

"Their differentiation as to remedies makes much sense, for these reasons: (a) The harm done by a defendant's breach of a plaintiff's confidence is the use of the secret to the plaintiff's 'loss' or 'detriment.' (b) By defendant's wrong he deprives plaintiff of a trade secret defined as something which gives plaintiff 'an opportunity to obtain an advantage over competitors.' (c) Where the device or process consists of a 'novel invention,' the plaintiff may have chosen not to patent it—which would limit the period of his monopoly—but to keep the invention to himself with the expectation that no one, except those in his confidence, will discover the secret, so that his monopoly will endure for an unlimited time. If the defendant comes to know the secret of such an invention by improper means his use of this knowledge will cause a loss to plaintiff for an indefinite future period during which plaintiff will lose his 'opportunity to obtain an advantage over competitors.' Wherefore a perpetual injunction affords a proper protection—a protection as enduring as the monopoly grounded on the secret invention. (d) But where the secret involves only a slight, non-patentable and easily-discoverable improvement, competitors will soon, in all probability, legitimately learn how to contrive this improvement. Consequently, defendant's wrong has caused a loss of plaintiff's 'advantage over competitors' which, at most, would not have lasted long. Perpetually to enjoin de-

fendant in such circumstances would be to harm him without regard to the loss or detriment suffered by plaintiff.

"In short, such an injunction—continued beyond the time when, in all likelihood, the trade, by legitimate means will catch up with the plaintiff—is sheer punishment, nothing else. In a closely related tort field, when a defendant has knowingly copied plaintiff's trade-name, a court will not issue a perpetual injunction against defendant's doing business but will allow defendant to continue in business if he adopts a revised name that is not likely to confuse. When the damage to plaintiff ceases, the restraint of defendant ends; the restraint does not continue thereafter for the purpose of punishing the wrongdoer.

"So here, I think no injunction should issue. True, these defendants have done a legal wrong and acted unethically. But that is also true in many a tort case where there is no punitive or deterrent element in the judgment except that contained in the exaction of damages that will roughly compensate the plaintiff; when, in such a case, damages achieve the end of thus compensating plaintiff, the possibility that they do no more to punish the defendant is not regarded as showing that damages are so 'inadequate' as to justify equitable relief; nor has the failure to issue injunctions in such cases been regarded as encouragement to wrongdoers. No more should it be so regarded in the case at bar. To say that a denial of a perpetual injunction in a case like this will be to destroy any real requirement of good faith in business-trust relations is to assert confidently that the grant of such an injunction would serve, punitively, to deter breaches of good faith in such relations. But as there is no basis in our present state of ignorance, about the deterrent effect of judgment in civil suits for such an assertion, I think we ought not rely on it to justify punitive injunctions."

The record before us indicates that a large number of units embodying plaintiff's modification of the basic hydrostatic drive have been marketed commercially. The harm caused plaintiffs by de-

fendant's misappropriation is thus diminished to the extent that other competitors in the industry could, and perhaps have, legally duplicated the equipment. The award of a permanent injunction in this case prevents defendant from doing that which others in the field could lawfully do. We think it obvious that such relief is punitive, rather than compensatory in nature, and therefore, inappropriate. Damages, properly assessed, will fully compensate plaintiff for the loss occasioned by defendant's disloyalty.

Accordingly, we vacate the injunction issued by the trial court, as it applies to the manifold design information, and remand this case for the assessment of damages. In determining the amount of those damages, the trial court may properly consider *inter alia* the amount of time, labor and money expended by plaintiff in designing, fabricating, and testing the manifold's modification; profits lost by plaintiff as a result of defendant Hull's misappropriation; the existence or absence of competitors other than defendant who manufacture equipment embodying the modification. We are confident that the parties will present for the trial court's consideration other factors to be considered in arriving at the aggregate damages assessable. Our suggestions here are only illustrative and are in no way to be construed as limiting the traditional power of the trial court to assess damages for the purpose of compensating plaintiff for the loss he sustained as the result of defendant Hull's misappropriation of the trade secret.

## CUSTOMER LISTS

During the course of his conclusions of law, the trial court in this case noted that:

"The plaintiffs' customers were not easily ascertainable. The customers of hydrostatic drive units are not found from a perusal of trade journals, telephone books, or the like. They are developed and nurtured solely by much investigation and 'door knocking.' Thus, unquestionably, the customer list of plaintiffs is subject to trade secret protection. In *Federal Laundry Co v Zimmerman,* 218 Mich 211, 214; 187 NW 335 (1922), wherein the court stated, citing *Grand Union Tea Company v Dodds,* 164 Mich 50; 128 NW 1090 (1910):

" 'This Court there recognized the *property* right of the employer in his list of customers which had been given to and used by the employees, and *inhibited by injunction* the use thereof or the use of a copy surreptitiously obtained by the employee for the benefit of a competitor and required the employee to furnish the employer with lists he had withheld.' " (Emphasis in the original.)

However, in this case, the balance of the court's remarks, in *Zimmerman, supra,* are pertinent:

"But upon the question here involved we declined to restrain the defendant from earning a living by soliciting business from his former employer's customers. Mr. Justice HOOKER, who wrote for the Court [in *Dodds, supra],* said:

" 'We are of the opinion, however, that he cannot be restrained from selling his commodities, for himself or for any employer, in any part of the city, or to any person, so long as he does not use any property belonging to the complainant, or copies thereof that were surreptitiously made.' "

In both *Zimmerman* and *Dodds* the Supreme Court denied injunctive relief, where there was no showing that the defendant had misappropriated tangible customer lists of his employer. Likewise, in this case, it was conceded that defendant Hull did not physically misappropriate plaintiff Kubik's customer lists. Indeed, the evidence demonstrates that defendant Hull had established a number of

customer contacts prior to his employment with plaintiff and that he was, in fact, hired because of those contacts. In the absence of any evidence that defendant physically misappropriated tangible customer lists owned by plaintiff, the trial court's granting of injunctive relief is inappropriate. Further, under *Dodds* and *Zimmerman, supra,* we think defendant's actions in this regard were wholly lawful and violated no duty he owed to plaintiff. *Cf. Shwayder Chemical Metallurgy Corp v Baum,* 45 Mich App 220, 225; 206 NW2d 484 (1973) (physical misappropriation of customer list); and see Annotation, 28 ALR3d 7, *Former Employee's Duty, in Absence of Express Contract, Not to Solicit Former Employer's Customers or Otherwise Use His Knowledge of Customer Lists Acquired in Earlier Employment.*

Accordingly, the trial court's grant of injunctive relief with respect to plaintiff's customer lists is vacated.

### *MATHEMATICAL FORMULA—"TOTAL EQUIVALENT TIME"*

The trial court enjoined defendants from the use of this mathematical formula, allegedly developed by plaintiff. The evidence adduced at trial, including the *in camera* testimony of expert witnesses, supports the proposition that this formula was unique, although defendant suggests that the contrary is true. The formula is used by plaintiff to determine the speed at which a conveyor system will have to move to transport products over a given distance within a specified time. The formula, not superficially complex, is apparently valuable in that it provides a simplified procedure by which to take into account the effects of acceleration and deceleration on the total elapsed time.

However, from our review of the record, we think the trial court clearly erred in holding that it constituted a trade secret. Defendant Hull testified that, notwithstanding plaintiff's prohibitions, he divulged the formula to customers and continued to do so, with plaintiff's knowledge. Despite plaintiff's anger and the instructions respecting confidentiality, plaintiff's acceptance, however hesitantly, of defendant's disclosure of the formula renders his claim to trade secret protection unfounded.

The trial court erred in determining that the formula in question constituted a trade secret, and his grant of injunctive relief with respect thereto is vacated.

In addition to the specific information discussed above, the trial court enjoined defendants from utilizing a number of less significant trade secrets.

First, defendants were enjoined from using any information derived from defendant Phillips' examination of an "experimental machine" during his clandestine sojourn in plaintiff's shop on November 18, 1969. Assuming that this machine was, in fact, a Kubik Hydradrive, continued injunctive relief would be pointless, in light of our remand for assessment of damages in connection with defendant's misappropriation of the manifold design information. Accordingly, that portion of the judgment granting such relief is vacated.

Second, defendants were enjoined from using plaintiff's system of pricing the modified hydrostatic drive units. It will be recalled that Hull, while still employed by plaintiff, conveyed to defendant Phillips this information, enabling him successfully to bid against plaintiff for the Jervis B. Webb contract. The evidence indicates that this system, termed "price billed-up," was unique only

to the extent that it depended upon a particular familiarity with plaintiff's product. Since that familiarity is now wrongfully shared by defendants, injunctive relief at this time would be inappropriate. Of course, the trial court will undoubtedly consider the conduct of the defendants in connection with the Jervis B. Webb contract in assessing damages. The trial court's grant of injunctive relief with respect to plaintiff's pricing information is vacated.

Finally, the trial court enjoined defendants from utilizing design assembly information and certain schematic drawings purloined by defendant Hull. Since this information is simply descriptive of the manifold modification, injunctive relief would be unavailing; consequently, the grant of such relief is vacated.

To summarize, we hold that the trial court properly concluded (1) that the manifold design information, experimental drive unit, pricing system, design assembly information, and confidential drawings constituted equitably protectable trade secrets; (2) that defendant Hull, in violation of a duty he owed plaintiff Kubik, Inc. misappropriated the above specified trade secrets and disclosed them to the other named defendants; (3) that such improper disclosure detrimentally affected the plaintiffs' interests and entitles them to relief. We further hold that the granting of permanent injunctive relief, where the information sought to be protected has been publicly marketed without restriction, is inappropriate and erroneous. We remand this case to the trial court for further proceedings consistent with this opinion, specifically the assessment of damages attributable to the defendants' unlawful disclosure and use of plaintiffs' foregoing trade secrets.

Some may argue that our disposition of this appeal limits unnecessarily the power of equity to protect the integrity of relationships based on mutual trust and faith; that it encourages and promotes disregard of even minimal standards of business conduct; that it allows a faithless employee to pirate the painstakingly developed trade secrets of his employer if only he is willing to pay the price in damages. Of course, we neither intend nor expect our views here to produce such untoward results. We reaffirm the undisputed power of equity to protect trade secrets by injunction, temporary or permanent, in appropriate circumstances; we recognize the right of one who by his labor and efforts develops a trade secret to be compensated for any loss occasioned by its unauthorized disclosure. However, for equity permanently to enjoin a former employee from using information which the possessor himself has placed in the public domain is unabashedly punitive and wholly out of proportion to any harm suffered by the possessor as a result of the employee's breach of faith. An award of damages, properly assessed, will make the plaintiff whole; he can neither ask for nor expect more.

Reversed and remanded for further proceedings consistent with this opinion.