John J. ROTHSCHILD, James L. Donahue, and Jero Engineering, Plaintiffs,

v.

FORD MOTOR COMPANY, Defendant.

No. 96–40275.

United States District Court, E.D. Michigan, Southern Division.

March 27, 1998.

Arnold S. Weintraub, Weintraub & Brady, Bingham Farms, MI, for John J. Rothschild, James L. Donahue, Jero Engineering.

Ernie L. Brooks, Frank A. Angileri, Brooks & Kushman, Southfield, MI, for Ford Motor Company.

Ernie L. Brooks, for Ford Motor Company.

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING SUMMARY JUDGMENT TO DEFENDANT ON ITS COUNTER-CLAIM

GADOLA, District Judge.

On May 1, 1996, plaintiffs John J. Rothschild, James L. Donahue, and Jero Engineering filed the instant action against defendant Ford Motor Company alleging two counts of patent infringement, as well as claims of unfair competition and unjust enrichment. Presently before this court is the defendant's motion for summary judgment on all of the plaintiffs' claims. For the following reasons, the defendant's motion will be granted.

### FACTS

Sand is used in metal casting foundries to make molds and cores for casting things like engine blocks for automobiles. The sand that is used in the molds and cores is coated with an organic binder that holds the grains of sand together like wet sand grains in sand castles on a beach. Before sand can be reused, the binder must be removed. The process by which the binder is removed from the sand is known as "sand reclamation."

In the past, it was considered uneconomical to reclaim sand. Historically, foundries discarded used sand because the cost-per-ton of reclaiming sand exceeded the combined cost-per-ton of buying new sand and disposing of it in a landfill. By the 1990's, however, reclaiming sand became a viable economic alternative because disposal costs had risen while energy costs had remained fairly constant. In addition, environmental awareness had risen, prompting foundries to avoid landfill use if possible.

### Methods of Sand Reclamation

One particular type of sand reclamation is known as "thermal sand reclamation." In this process, the binder-coated sand grains are exposed to temperatures ranging from 650 to 900 degrees Celsius (approximately 1200 to 1650 Fahrenheit) for a time period sufficient to completely burn off the binder, leaving clean sand for reuse.

Numerous thermal sand reclamation systems are known in the art. For instance, one kind of thermal sand reclamation system involves passing a horizontal bed of sand through a furnace and exposing the bed to heat and oxygen to burn off the binder. A second type of thermal sand reclamation system involves stacking sand in a vertical column and exposing it to heat to burn off the binder. A third type of thermal sand reclamation system is a horizontal rotary kiln (a.k.a. a "calciner"). This kiln has a refractory-lined cylinder sloped toward the discharge end and a burner mounted at either the feed or discharge end which heats the kiln to about 1,100 degrees Celsius (approximately 2,000 degrees Fahrenheit). The sand is tumbled through the kiln because of the rotary motion and the sand is thereby exposed to heat and air which burns off the binder.

A common problem with all of the aforementioned types of thermal sand reclamation systems is that they are not very efficient from the standpoint of the quantity of sand that can be reclaimed per unit time. Sand must remain in these reclamation units for a long period of time (i.e., 15–30 minutes) in order to burn off the binder. Aside from being inefficient, there is another problem with these systems. Frequently, these systems overheat causing an unwanted change in the sand's chemical characteristics.

"Gravity flow sand reclamation" was designed to solve the problems inherent in the

above-described thermal sand reclamation systems. In the gravity flow reclamation process, sand is placed into a tower-like furnace. As the sand falls to the bottom of the furnace by the force of gravity, the binder is exposed to heat and is burned off. Gravity flow sand reclamation is seemingly more efficient than other thermal sand reclamation processes since sand requires less retention time in the furnace to incinerate the binder.

Actually, a primary advantage of gravity flow sand reclamation (i.e., less retention time) is also a disadvantage. Sand descends in gravity flow sand reclaimers at such a rapid rate that, from the time the sand enters the reclaimer to the time it reaches the bottom, not enough heat transfers to the sand to completely burn off all the binder. In an effort to combat this problem, plaintiff Jero Engineering Company ("Jero"), through its principal John J. Rothschild[1] and in cooperation with James L. Donahue,[2] designed the so-called "Jero Reclaimer" and obtained two patents for their invention. The first patent, "the '288 Patent," was obtained for the *Jero Reclaimer apparatus* itself and the other patent, "the '888 Patent," was obtained for the *method* of using the Jero Reclaimer.[3]

The Jero Reclaimer, depicted below, works as follows. Sand is fed into the top of the Jero Reclaimer (28) and then is moved by a conveyor (32) to a chute (34) which dumps the sand into a furnace (16). After entering the furnace, sand falls down it by the force of gravity, passing through a series of grids as it descends (52A–52F). As the sand cascades from grid to grid, the binder material on the sand is incinerated by torch heating burners (56) mounted to the side of the furnace.

Upon exiting the furnace, the sand falls into a retention well (62) where it is kept for an additional 45 seconds to two minutes.

The retention well is made up of air permeable walls (66) through which heated air passes. This heated air further removes any binder material remaining on the sand.

After designing the Jero Reclaimer, plaintiffs sought out entities to manufacture it on a full-scale basis. One particular place plaintiffs solicited prospective manufacturers was the American Foundry Society meeting in 1990. At that meeting, Rothschild distributed flyers describing the Jero Reclaimer to persons at the meeting. Rothschild also approached George Good, an engineer at Ford Motor Company ("Ford"), to discuss the possibility of an arrangement in which Ford provided the funding and plaintiffs supplied the engineering knowledge to develop and test a production size version of the Jero Reclaimer.

Good and his supervisor, Richard Lipka, Manager of Ford's Plant Engineering Department, were interested in Rothschild's offer. From 1991 through 1993, Lipka, Good and other Ford engineers worked to obtain $785,000 for the Jero Reclaimer project from

---

**1.** Rothschild allegedly started Jero in 1982 after spending 36 years in the foundry industry. For seven years prior to starting Jero, Rothschild was the chief engineer for Conveyor Engineering Company in Detroit.

**2.** Donahue and his company specialize in combustion-related processes.

**3.** As stated in Patents '288 and '888:

[A] principle object of the present invention[s][was] to provide an improved method and apparatus for continuously recovering (reclaiming) used foundry sand which includes a substantially free flowing, downwardly gravitating dispersion of sand particles passing through a vertically disposed furnace which terminates in a heated retention chamber. The retention chamber provides additional dwell time to permit substantially complete combustion of any residual particulate or carbonaceous coating.

Ford's "Factory of the Future" fund, a research and development fund, as well as Ford's Casting and Forging operations fund.[4] Ford's engineers also worked with plaintiffs in an attempt to negotiate a written agreement. In the end, no agreement was reached and the parties discontinued their relations. The parties blame each other for their failed contractual relationship.

After the dealings with plaintiffs fell through, Lipka instructed Good to continue development of a gravity flow thermal sand reclaimer with outside consultants. The Montrose firm, a Windsor, Ontario engineering design firm, Rorison Industrial Electric, a Windsor, Ontario electrical design engineering firm, and North American Manufacturing, a company based in Cleveland, Ohio, all were hired by Ford to continue the gravity flow thermal sand reclamation project.

In 1994, the so-called "Ford Reclaimer" (which is referred to by the defendant as the "Montrose Reclaimer") was finally constructed. The Ford Reclaimer, depicted below, operates in the following fashion. Sand enters the Ford Reclaimer at the top of the apparatus and falls through the device by the force of gravity. Cylindrical tubes, 2823 to be exact, slow the flow of the sand through the apparatus down to a trickle. Two burners in the bottom of the Ford Reclaimer heat the 2823 cylindrical tubes which in turn heat the sand on contact, burning off the binder material. The sand exits the Ford Reclaimer through a funnel at the base.

In May, 1996, Jero, Rothschild and Donahue, after learning about the Ford Reclaim-

er, filed this action. Plaintiffs allege that the Ford Reclaimer infringes patents '288 and '888. Plaintiffs also allege that in designing the Ford Reclaimer, defendant used plaintiffs' proprietary information without plaintiffs' permission which constitutes unfair competition and unjust enrichment. On August 29, 1997, Ford filed the instant motion for summary judgment on all of the plaintiffs' claims.

### *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no genuine issue of material fact when the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.,* 25 F.3d 1320, 1323 (6th Cir. 1994) *(quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "The mere existence of some alleged factual dispute between the parties will not defeat the otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 247–48. In deciding a motion for summary judgment, the court must consider all evidence together with all inferences to be drawn therefrom "in a light most favorable to the party opposing the motion." *Watkins v. Northwestern Ohio Tractor Pullers Ass'n., Inc.,* 630 F.2d 1155, 1158 (6th Cir.1980).

If the movant meets the standard specified at Rule 56(c), then the opposing party must

---

**4.** Plaintiffs point out in their brief that defendant also sought a funding grant from the Canadian Ministry of Environment, but the Ministry rejected the proposal.

come forth with "specific facts showing that there is a genuine issue for trial." *First National Bank v. Cities Serv. Co.*, 391 U.S. 253, 270, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) Fed.R.Civ.P. 56(e). The non-moving party "is not entitled to a trial merely on basis of allegations; significant probative evidence must be presented to support the complaint." *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir.1993), *cert. denied*, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993); *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). And, "if the adverse party does not respond, summary judgment, if appropriate shall be entered against the adverse party." Fed.R.Civ.P. 56(e); *Rizzo v. Goode*, 423 U.S. 362, 370–71, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *O'Hara v. Wigginton*, 24 F.3d 823, 826–27 (6th Cir.1994).

### Plaintiffs' Patent Infringement Claims—Counts I and II

■ The first two counts in plaintiff's complaint accuse defendant of direct and contributory infringement of the '288 (apparatus) patent and the '888 (method) patent. These claims are governed by Title 35, Section 271 of the United States Code which provides in part:

(a) Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

(c) Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or

commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

35 U.S.C. § 271(a) and (c). Plaintiff bears the burden of proving infringement. *Morton Int'l, Inc. v. Cardinal Chemical Co.*, 5 F.3d 1464, 1468 (Fed.Cir.1993).

### Whether the United States Patent Laws Apply Here

Defendant's first argument in support of its motion for summary judgment on plaintiffs' patent claims is that the alleged infringing activities occurred outside the United States and, thus, the United States patent laws do not apply. This court finds that the United States patent laws are inapplicable and that defendant is therefore entitled to summary judgment on plaintiffs' patent infringement claims.

■ There is a territorial limit to the reach of the United States' patent laws. Generally speaking, the right conferred by a patent is confined to the United States and its territories and infringement of this right cannot be predicated on acts wholly done in a foreign country. *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*, 235 U.S. 641, 650, 35 S.Ct. 221, 59 L.Ed. 398 (1915). *See also Ortho Pharmaceutical Corp. v. Genetics Institute, Inc.*, 52 F.3d 1026, 1033 (Fed.Cir.) ("a U.S. patent grants rights to exclude others from making, using, and selling the patent invention only in the United States"), *cert. denied*, 516 U.S. 907, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995). There are exceptions to this general rule however. For instance, 35 U.S.C. § 271(f)(1) (" § 271(f)(1) exception") provides that "whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States" is liable for infringement.[5] The rea-

---

5. In passing 35 U.S.C. § 271(f)(1), Congress intended to close a loophole in patent law. Under the state of the law as it existed prior to the passage of § 271, an individual or entity who provided components in the United States and

assembled them outside the United States could avoid the patent laws. *See e.g., Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 92 S.Ct. 1700, 32 L.Ed.2d 273, *reh'g. denied*, 409 U.S. 902, 93 S.Ct. 94, 34 L.Ed.2d 165 (1972).

son for this exception is to ensure that a person or entity does not avoid the United States patent laws by supplying components of a patented product in this country but assembling those components abroad. *T.D. Williamson, Inc. v. Laymon,* 723 F.Supp. 587 (1989), aff'd., 923 F.2d 871 (Fed.Cir. 1990).[6]

Despite this exception, Ford maintains that it is entitled to summary judgment as a matter of law on plaintiffs' patent infringement claims. Defendants assert that based on the uncontroverted facts, it is clear that no substantial portion of the accused activities (e.g., design, manufacture, or use of the Ford Reclaimer) took place in the United States and thus, the patent laws are wholly inapplicable.

At oral argument, plaintiffs' counsel conceded that no substantial portion of the alleged infringing activities of the '888 patent occurred in the United States. Accordingly, this court will enter summary judgment to defendant on plaintiffs' claim of infringement of the '888 patent. The issue still remains, however, whether the patent laws apply to plaintiffs' claim of infringement of the '288 patent.

■ Plaintiffs insist that there is a genuine issue of material fact regarding whether the § 271(f)(1) exception applies with respect to their claim of infringement of the '288 patent. As stated above, the § 271(f)(1) exception applies when an entity, without authority, supplies or causes to be supplied in or from the United States *all* or a *substantial portion* of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. Plaintiffs proffer evidence showing that three components of the Ford Reclaimer were supplied by United States companies. These three components include two burn-

ers[7] and a cooling mechanism.[8] This court finds that no reasonable juror could conclude that these three components, taken together or viewed separately, comprise "all" or a "substantial portion" of the components making up the Ford Reclaimer. In this court's opinion, any rational juror would find these three components contribute minimally to the accused device and therefore § 271(f)(1) is wholly inapplicable. *Compare T.D. Williamson, Inc. v. Laymon,* 723 F.Supp. 587, 592 (N.D.Okl.1989) (court found the § 271(f)(1) exception applicable when *all but one of the* parts of a patented product were produced in the United States and shipped to Venezuela for assembly).

### *Whether Defendant Literally Infringed Plaintiffs' '288 Patent*

Assuming arguendo that the United States patent laws apply to plaintiffs' claim of infringement of the '288 patent, the question becomes whether defendant has infringed this patent either literally or under the doctrine of equivalents. This court finds that defendant did not infringe the '288 patent.

#### *Literal Infringement*

■ In determining whether there has been infringement, the court must apply a two-step analysis. First, plaintiffs' claims must be construed, a question of law for this court. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970 (Fed.Cir.1995) (en banc), *aff'd.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Second, plaintiffs' claims must be compared to the accused device to determine if there has been infringement.

■ To prove literal infringement, plaintiffs must demonstrate that each and every element of a claim is found in the accused product or process. *Becton Dickinson & Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 796 (Fed. Cir.1990); *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576 (Fed.Cir.1988), *on remand,* 11 U.S.P.Q.2d 1634, 1989 WL 29912 (D.Or.1989). If a single element is missing,

---

6. Other exceptions also exist. Yet, since they clearly are not applicable here, they will not be discussed.

7. The two burners were allegedly supplied by North American Manufacturing, a company located in Cleveland, Ohio. (See Exhibit H to

Plaintiffs' Exhibits In Support of Plaintiffs' Response to Defendant's Motion for Summary Judgment).

8. The cooling mechanism was allegedly supplied by Kloster Corporation located in Minneapolis, Minnesota.

there is no literal infringement. *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1535 (Fed.Cir.1991).

■ If the claims are written in a means-plus-function form as permitted by 35 U.S.C. § 112, they "are interpreted to cover the [corresponding] structure set forth in the specification and its equivalents." *Kahn v. General Motors Corp.,* 135 F.3d 1472, 1476 (Fed.Cir.1998); *Pennwalt Corp. v. Durand-Wayland, Inc.,* 833 F.2d 931, 934 (Fed.Cir. 1987), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988). "A structure disclosed in the specification is only deemed to be a 'corresponding structure' if the specification clearly links or associates that structure to the function recited in the claim." *Kahn,* 135 F.3d 1472, 1476.

### Defendant Did Not Literally Infringe the '288 Patent

■ Defendant insists that it did not literally infringe the '288 patent, and specifically claim 1 of the '288 patent, the only independent claim.[9] What is claimed in Claim 1 is:

A thermal sand reclamation apparatus for removing a coating from used sand particles, comprising:

a furnace defining an elongated combustion chamber therein; sand feeding means associated with a first end of said furnace for feeding said used sand particles through said combustion chamber, said sand feeding means forming an air-tight seal between said combustion chamber and the ambient atmosphere;

dispersion means disposed in said combustion chamber for dispersing said used sand particles passing therethrough and defining a plurality of open zones intermediate thereof;

heating means for producing a turbulent combustion supporting atmosphere in each of said open zones for thermally treating said used sand particles so as to generate substantially instantaneous vaporization and combustion of said coating;

accumulating means disposed adjacent a second end of said furnace for receiving said thermally treated sand particles exiting said combustion chamber, said accumulating means having a lower discharge opening adapted to be filed with said treated sand particles;

means for maintaining a combustion supporting atmosphere within said accumulating means such that heated air is introduced into said accumulating means for further exposing said thermally treated sand particles to a combustion supporting atmosphere, said heated air acting to maintain said treated sand particles at a desired temperature to provide dwell time for purging trapped residual vapors for combusting residual coatings remaining on said thermally treated sand particles; and

discharge means operable associated with said lower discharge opening for selectively discharging a predetermined quantity of reclaimed sand therefrom, said discharge means and said reclaimed sand particles confined in said lower discharge opening being coactive to form an air-tight seal between said ambient atmosphere and said accumulating means; and

sensing means for enabling accumulation of said predetermined quantity of treated sand in said accumulating means for actuating said discharge means.

■ This court finds that defendant is entitled to summary judgment on plaintiffs' claim of literal infringement of claim 1 of the '288 patent since plaintiffs have not introduced evidence sufficient to establish, by a preponderance of the evidence, that the Ford Reclaimer contains every element of that claim. One of the elements of claim 1 is an "accumulating means," the function of which is to receive and hold sand particles as they exit the furnace of the reclaimer. The corresponding structure for the accumulating means is depicted in Figures 1, 5 and 6 (part 62) of the patent. The accumulating means is described at column 6, lines 32 to 36 of the '288 patent specification as a "retention well." Plaintiffs have not introduced any evidence showing that the Ford Reclaimer has such a counterpart. The Ford Reclaimer appears to have no structure for receiving sand particles *after they have been treated in the furnace.* Indeed, the structure of the Ford Reclaimer which plaintiffs argue is the equivalent to the accumulating means of

9. If no patent infringement of the independent claim, claim 1, is found, it follows that there is no infringement of the other dependent claims. It is axiomatic that dependent claims cannot be found infringed unless the claims upon which they depend have been found to have been infringed. *Wahpeton Canvas Co., Inc. v. Frontier, Inc.,* 870 F.2d 1546, 1553 (Fed.Cir.1989).

the '288 patent is located in the furnace of the Ford Reclaimer.

Even if the Ford Reclaimer had an accumulating means, this court still would not find any literal infringement since the Ford Reclaimer lacks another element of the '288 patent, to wit: a "means for maintaining a combustion supporting atmosphere within said accumulating means such that heated air is introduced into said accumulating means for further exposing said thermally treated sand particles to a combustion supporting atmosphere, said heated air acting to maintain said treated sand particles at a desired temperature to provide dwell time for purging trapped residual vapors for combustion in said combustion chamber and for combusting residual coatings remaining on said thermally treated sand particles." The corresponding structure which is this means is a wall within the retention chamber (numbered as Part 66 in Figures 1, 5, and 6 of the '288 patent), which contains pores or slots that enable heated air and oxygen to enter the retention well and incinerate any remaining binder material on the sand particles. The Ford Reclaimer clearly has no structure equivalent to this air permeable wall. Surely, the nonpermeable funnel shaped exit of the Ford Reclaimer is not equivalent to the air permeable accumulator of the patented device because it cannot be utilized to pump air through sand residing in the funnel section thereby permitting combustion of any residual binder materials on the sand.

In sum, this court finds that the accused device is missing several elements of Claim 1 of the patented device, and therefore plaintiffs' claim of literal patent infringement fails as a matter of law. *See Key Mfgr. Group, Inc. v. Microdot, Inc.,* 925 F.2d 1444, 1449 (Fed.Cir.1991) (the absence of even a single element of a claim from the accused device precludes a finding of literal infringement).

*Whether Defendant Infringed Patents '288 and '888 Under the Doctrine of Equivalents*

Plaintiffs insist that there is a genuine issue of material fact as to whether defendant infringed patent '288 under the "doctrine of equivalents." Under that doctrine,

"infringement may be found [ ] if an accused device performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention." *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 934 (Fed.Cir.1987) (emphasis added) (citing *Perkin–Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 901–902 (Fed.Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984)); *Graver Tank & Mfgr. Co. v. Linde Air Products Co.,* 339 U.S. 605, 609, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

Proving infringement through the doctrine of equivalents requires a showing that the accused product or process contains an element equivalent to each and every element of the claimed invention not literally found in the accused product or process. *Warner–Jenkinson Co. v. Hilton Davis Chemical Co.,* 520 U.S. 17, ——, 117 S.Ct. 1040, 1054, 137 L.Ed.2d 146 (1997) (*en banc*). "To be a 'substantial equivalent,' the element substituted in the accused device for the element set forth in the patented claim must not be such as would substantially change the way in which the function of the claimed invention is performed." *Pennwalt Corp.,* 833 F.2d at 935 (citing *Perkin–Elmer,* 822 F.2d at 1522–33). Equivalence is an "objective" inquiry and should be conducted on an element-by-element basis. *Hilton Davis,* 520 U.S. ——, 117 S.Ct. at 1044, 137 L.Ed.2d 146. Moreover, the question of equivalence is a question of fact. *Id.* at 1053.

The doctrine of equivalents was designed to do equity and to relieve the inventor from a semantic straitjacket when equity requires. It was not, however, designed to permit wholesale redrafting of a claim to cover a non-equivalent device, i.e., to permit a claim expansion that would encompass more than an insubstantial change. *Pennwalt Corp.,* 833 F.2d at 935 (citing *Perkin–Elmer Corp.,* 822 F.2d 1528). Indeed, too broad an application of the doctrine must be avoided. "In applying the doctrine of equivalents, each limitation must be viewed in the context of the entire claim." *Id.*

Focusing attention on each individual element of claim 1 of the '288 patent (the only independent claim), it is clear that there is no infringement of the same by the defendant under the doctrine of equivalents. This court finds the Ford Reclaimer substantially

different from the device claimed in the '288 patent. The plaintiffs have failed to introduce any evidence that would support a finding that there is a structure in the Ford Reclaimer similar to the structure of the accumulating means (a.k.a. "retention well") in the patented device. Additionally, the record is devoid of any evidence that the accused device contains a counterpart similar to the air permeable wall in the '288 patent, the function of which is to provide a means for maintaining a combustion supporting atmosphere by allowing heated air and oxygen to be introduced into the retention well for further non-turbulent incineration of the binder materials on the sand particles after the sand particles leave the furnace.[10]

### *Unfair Competition*

▆▆▆ In addition to their patent infringement counts, plaintiffs allege unfair competition. Specifically, plaintiffs claim that without permission, the defendant utilized various proprietary materials and information furnished by plaintiffs while the parties were in the process of negotiating a written agreement, which never materialized. As a preliminary matter, this court finds plaintiffs' claim of "unfair competition" to be more precisely a claim of "misappropriation of a trade secret,"[11] the elements of which are as follows:

(1) the existence of a trade secret;[12]

(2) its acquisition in confidence; and

(3) the defendant's unauthorized use of it. *Aerospace America, Inc. v. Abatement Technologies*, 738 F.Supp. 1061, 1069 (E.D.Mich. 1990). The rationale behind the tort of misappropriation of trade secrets is "to maintain standards of commercial ethics and encourage invention." *Wayne State University et al. v. Bronstein*, 1994 WL 854863, at *55 (Mich.Cir.Ct. Aug.5, 1994).

▆▆▆ Plaintiffs allege the following fifteen items constitute "proprietary information" used by the defendant:

(1) drawings which had dimensions from which it could be determined the size of pipes, size and distribution of burners, and the required number of British Thermal Units ("BTU's") for proper construction of a thermal sand reclaimer;

(2) information describing how to control the zoned furnace temperatures;

(3) information relating to the outlets and temperature controls;

(4) information setting forth the amount of air used for purging the system;

(5) information consisting of time and temperature curves for operation of a thermal sand reclaimer;

(6) the drop time calculations for this type of reclaimer and the methods for coming up with such calculations;

(7) information regarding the temperature settings for the sand discharge, zone temperature control, and purge temperatures as

---

**10.** Note that the two burners located in the discharge unit cannot be viewed as substantially similar to the "means for maintaining a combustion supporting atmosphere in said accumulating means" as claimed in the '288 patent. The burners located in the discharge unit of the Ford Reclaimer serve the function of heating the tubes, which in turn heat the sand on contact as it travels down the tubes. They do not serve the function of further incinerating the particles after their descent through the tubes. Moreover, the burners do not introduce heated air into the discharge unit, but rather introduce a burning gas/air mix.

**11.** "Unfair competition ordinarily consists in the simulation by one person, for the purpose of deceiving the public, of the name, symbols, or devices employed by a business rival, or the substitution of the goods or wares of one person for those of another, thus falsely inducing the purchase of his wares and thereby obtaining for himself the benefits properly belonging to his competitor." *Marion Lab., Inc. v. Michigan Pharmacal Corp.*, 338 F.Supp. 762, 767 (E.D.Mich.1972), *aff'd.*, 473 F.2d 910 (6th Cir.

1973). Defendant's alleged conduct is not of the sort intended to embody a claim of unfair competition.

**12.** "A trade secret consists of any valuable formula, pattern, device, process, or other information that is used in one's business and gives the possessor a competitive advantage over those who do not know or use the information." *Kubik, Inc. v. Hull*, 56 Mich.App. 335, 347, 224 N.W.2d 80 (1974) "[T]here must be evidence presented that sufficient measures have been taken to guard the secrecy of the information and preserve its confidentiality." *Id.* Such measures generally include an express agreement, disclosure to another in confidence or utilization of security precautions. "The term 'trade secret' does not encompass information which is readily ascertainable." *Id. See* Restatement Torts § 757, cmt. b. (listing factors a court should consider in determining whether particular information is a trade secret); *Manos v. Melton*, 358 Mich. 500, 508, 100 N.W.2d 235 (1960) (same).

well as information concerning acceptable temperature ranges for these functions; (8) pictures of various grid configurations; (9) information regarding the need to maintain the appropriate level in the dwell chamber and the means for accomplishing the same; (10) information relating to the pneumatic discharge gate control system and the need to maintain the elevated purge air temperature and flow to successfully strip the remaining vapors; (11) information relating to the purge air distribution media for low purge air drop; (12) information relating to the means for determining drop time, the number of necessary grids, the appropriate temperatures, and the overall system height; (13) Ford was advised of the use of fiber refractory liner with high emissivity, in a means which avoided erosion and a method to avoid erosion through the design of grids and the support system; (14) information regarding the method of distributing heat input in a decreasing requirement through the height of the unit, a critical requirement; and (15) information regarding a completely developed control and safety system for thermal sand reclaiming (e.g., preliminary schematic piping drawing, videotape on prototype and operation).

In its brief in support of summary judgment, defendant provided a detailed table explaining why it did not use the aforementioned fifteen items. For instance, defendants argue that items 1, 2, 3, and 15 could not have been used by defendant since all these items relate to the multiple, independently controlled burners which are present in the Jero Reclaimer, but not the Ford Reclaimer. Defendants also argue that items 4, 7, 9, 10, 11, and 15 could not have been used in developing the Ford Reclaimer since these items of information relate to the Jero Reclaimer's retention well, which Ford does not have.

In their response brief, plaintiffs do not address the table provided by the defendant. Rather, plaintiffs merely argue that there is a question of fact as to whether defendant used the information supplied by plaintiffs because individuals on the Ford team were totally unfamiliar with sand reclaimers, but nevertheless constructed one. This is wholly insufficient to give rise to a genuine issue of material fact as to whether defendant used plaintiffs' information. Plaintiffs must be more specific and point to facts showing that defendant actually used the information provided to it by the plaintiffs. *See e.g., Aerospace America, Inc. v. Abatement Technologies, Inc.,* 738 F.Supp. 1061, 1072 (E.D.Mich. 1990).

Plaintiffs also contend that there are a number of "interesting facts" which this court should be aware of in deciding whether to grant summary judgment to defendant on this claim. Yet, not one of these so-called "interesting facts" shows that defendant *used* plaintiffs' alleged proprietary information. Indeed, not one of these "interesting facts" is so much as tied to any one of the 15 categories of alleged "proprietary information" defendants allegedly used. Also, most of the "interesting facts" reveal that Ford's engineers have not determined various parameters for the Ford Reclaimer, such as the temperature at which the furnace is to be kept or the sand incoming rate, or the time for heat transfer. The ignorance of various Ford engineers, however, does not even give rise to an inference that Ford used plaintiffs' information. If Ford *had* used information furnished by plaintiffs, then presumably Ford would have already determined such parameters to be similar or identical to the parameters calculated for the Jero Reclaimer.

Moreover, plaintiffs have not pointed to any evidence showing that the information furnished to the defendant, which it allegedly used, was in fact "proprietary." The record is devoid of any evidence that plaintiffs provided information to defendant "in confidence." In fact, Rothschild conceded at his deposition that he freely distributed flyers revealing the design of the Jero Reclaimer to the defendant and others. Also, Rothschild admitted that use of the fiber refractory liner is routine in furnace designs, and as such item 13 could not be a "trade secret."

### *Unjust Enrichment*

Plaintiffs also allege that defendant has been unjustly enriched by using plaintiffs' proprietary information. In order to succeed on this claim, plaintiffs must show:

(1) the receipt of a benefit by the defendant from the plaintiff and (2) that it is inequitable that the defendant retain such benefit. *B & M Die Company v. Ford Motor Company,* 167 Mich.App. 176, 421 N.W.2d 620 (1988).

 In this instance, plaintiffs have not proffered evidence tending to establish that a benefit was conferred on the defendant from its alleged use of plaintiffs' information. Rather, plaintiffs merely make a blanket statement in their brief that "[w]ithout [plaintiffs' information,] Ford could not have built a reclaimer of this type as quickly as it did." (Plaintiffs' Response to Defendant's Motion for Summary Judgment at 25). Since an essential element of their unjust enrichment claim is benefit to the defendant, plaintiffs' failure to present any evidence establishing this element mandates an entry of summary judgment for the defendant on this claim.[13]

For all the aforementioned reasons, this court will enter summary judgment for defendant on all plaintiffs' claims. This court will also enter summary judgment for defendant on defendant's counterclaim for an order and judgment declaring that Ford has not infringed U.S. Patent Numbers 5,165,888 and 5,110,288.

### ORDER

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment is GRANTED and the plaintiffs' claims are dismissed with prejudice.

**IT IS FURTHER ORDERED** that summary judgment be entered for defendant on its counterclaim for an order and judgment declaring that Ford has not infringed U.S. Patent Numbers 5,165,888 and 5,110,288.

**SO ORDERED.**

### JUDGMENT

This action came before the court, Honorable Paul V. Gadola, District Judge, presiding, and the issues having been duly reviewed and a decision having been duly rendered.

**IT IS ORDERED AND ADJUDGED** that judgment be entered for the defendant on

plaintiffs' claims, that plaintiffs take nothing and that plaintiffs' claims be dismissed.

**IT IS FURTHER ORDERED AND ADJUDGED** that judgment be entered for the defendant on defendant's counterclaim declaring that Ford has not infringed U.S. Patent Numbers 5,165,888 and 5,110,288.

It is further **ORDERED** that the clerk serve a copy of the judgment by United States mail on the counsel for plaintiffs and on counsel for defendant.

---

**13.** Also, it is hard for this court to conceive of any benefit to the defendant from the use of plaintiffs' information since it is uncontroverted that the device designed by the defendant does not work.